FILED

2016 Sep-12  PM 12:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **TOMMY MURRAY, et al.,** | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **BIRMINGHAM BOARD OF EDUCATION,** | ) |
| | ) |
| | ) |
| Defendant**.** | ) |

**CIVIL ACTION NO.
2:13-CV-822-KOB**

**MEMORANDUM OPINION**

The court has withdrawn its Memorandum Opinion (doc. 149) and substitutes this

Memorandum Opinion in its stead.

Seventeen employees working in various schools within the Birmingham City school

system bring this Fair Labor Standards Act case; they claim they worked overtime without

compensation during the relevant time period.  The relevant period commences on May 1, 2010

if the alleged violation was willful, or commences on May 1, 2011 if the alleged violation was

not willful, and proceeds until the filing of this case on May 1, 2013, or the termination of

employment with the Board, whichever occurred first.[1]

The case comes before the court on "Defendant Birmingham Board of Education's

Motion for Summary Judgment" (doc. 70), and "Defendant's Motion to Strike" (doc. 92).  As to

---

[1] In this Memorandum Opinion, the court includes discussions of some of the Plaintiffs'
testimony and/or timesheets for periods after May 1, 2013.  These discussions provide a more
complete picture of the work and payment history of those Plaintiffs.  Whether such evidence
would be admissible at trial remains to be determined.

the motion for summary judgment, Defendant filed a brief and evidentiary material in support of

its motion for summary judgment (docs. 71 & 38-39, respectively, the motion relying on

evidence previously filed in support of a prior motion for summary judgment, which was

withdrawn).  The Plaintiffs responded with a brief and evidentiary material (docs. 80 & 81-82),

and Defendant replied (docs. 93 & 94).  As to the motion to strike, Plaintiffs filed a response

(doc. 97).

For the reasons stated in this Memorandum Opinion, the court WILL GRANT IN PART

and DENY IN PART both motions as further set out below.

## I. PROCEDURAL BACKGROUND

Although Plaintiffs filed this case in 2013, the court has stayed it twice: (1) from May 28,

2014 through April 8, 2015 pending the Eleventh Circuit's ruling on the immunity issue, initially

and pending re-hearing, in separate cases filed against different school boards[2] (doc. 57 - staying

case; & doc. 64 - continuing the stay pending re-hearing); and (2) from July 10, 2015 through

February 18, 2016 pending mediation (doc. 114 - notice of the unsuccessful conclusion to

mediation & doc. 127 - confirmation of lifting of the stay).

The court also has addressed various motions.  In the Amended Complaint, the Plaintiffs

sued not only the Defendant Birmingham Board of Education but also individuals, whom this

court dismissed (doc. 25) in response to those individual Defendants' motions (docs. 9 & 18).

On May 5, 2014, the Defendant Board filed a motion to dismiss Plaintiffs Shirley

Pritchett, Linda Mitchell, and Bridgette Jackson for failure to prosecute, because they did not

---

[2] *Walker v. Jefferson Cty. Bd. of Educ. & Weaver v. Madison City Bd. of Educ.,* 771 F.3d
748 (11th Cir. 2014) (holding that school boards in Alabama counties were not arms or alter egos
of the State for purposes of Eleventh Amendment immunity).

appear for their depositions.  (Doc. 41).  The court granted the motion as to Plaintiffs Pritchett

and Mitchell and dismissed them, but, because Plaintiff Jackson advised the court that she was

out of town for an unexpected family emergency on the date of her deposition, the court denied

the motion as to Jackson "without prejudice to its re-filing if Jackson fails in the future to

participate appropriately in the prosecution of this case."  (Doc. 55).  The Board filed two more

motions to dismiss Plaintiff Jackson. (Docs. 72 & 129).  Although the court denied the second

motion to dismiss as prematurely filed (doc. 84), after Ms. Jackson failed once again to appear at

a noticed deposition, the court granted the third request and dismissed Ms. Jackson's claims (doc.

137).

On May 5, 2014, the Defendant Board also filed its first motion for summary judgment

(doc. 36) as corrected (doc. 48), with evidentiary material (docs. 38 & 39, ), but the court struck

the accompanying brief as failing to comply with the court's requirements (doc. 43).   The Board

filed an amended brief with the court's permission (doc. 46) and an appendix to the amended

brief containing state court litigation and orders (doc. 47).   As noted earlier, shortly after this

motion came under submission, the court stayed the case while awaiting the Eleventh Circuit's

ruling in a separate case with a similar immunity issue.  When that ruling was adverse to the

Board, the Board withdrew its motion for summary judgment with the court's permission, with a

view to re-filing an amended version in light of the Circuit Court's ruling.  (Docs. 68-motion to

withdraw & 69-granting motion to withdraw).

In  2015, the Board filed both motions currently pending: on April 30, 2015, the Board

filed the second and current motion for summary judgment (doc. 70 and incorporating

previously-filed evidentiary materials, docs. 38 & 39); and on June 10, 2015, the Board filed the

3

pending motion to strike (doc. 92).  This court again stayed the case and suspended deadlines

pending mediation of the claims both in this case and in the related case of *Banks v. Jefferson*

*County Bd. of Educ.,* Case No. 12-1682-MHH. (Docs. 101 & 102).

After attempts to mediate this case stagnated (docs. 114), the parties in both *Banks* and

the instant *Murray* case held some joint evidentiary proceedings to determine whether issues in

the cases could be clarified and whether settlement remained an option (docs. 119 & 125).

Afterwards, this court determined that it must proceed with the pending motion for summary

judgment in the *Murray* case, and confirmed the lifting of the stay.   (Doc. 127).

## II.  MOTION TO STRIKE

The Defendant's motion to strike (doc. 92) requests that this court strike seven separate

evidentiary offerings numbered to correspond with the paragraphs in the motion: (1) the

declaration of Sharon Jackson (doc. 82-3); (2) (a & b)  the declarations of Angela Jackson (doc.

82-4, at pp. 1-7); (3) the declaration of Andrea Stallings (doc. 81-11); (4) the deposition of Dr.

Craig Witherspoon (doc. 82-5 in the instant case but taken in the case of *Reynolds v. Birmingham*

*Bd. of Educ.,* 10-CV-2963); (5) the affidavit of Katrina Cosby (doc. 82-G); and (6) the affidavit

of former Plaintiff  Bridgette Jackson (doc. 82-1).

As a preliminary matter, the court notes that the Board repeats in most paragraphs of its

motion the objection that Plaintiffs failed to "disclose[ ] this individual in their responses nor was

she mentioned as a witness in the hours of deposition testimony."  (Doc. 92, at 2-5, ¶¶  1, 2, 3, 5,

and 6 (which specified Bridgette Jackson by name instead of using the generic term "this

individual.").  The objection makes sense when the Board used it to object to testimony of non-

parties, such as Sharon and Angela Jackson and Katrina Cosby.  But, the objection is nonsensical

4

when applied to Plaintiff Andrea Stallings (doc. 92, at 3, ¶ 3) and to former Plaintiff Bridgette Jackson (doc. 92, at 4, ¶ 6); obviously, the parties do not have to disclose their own names as potential witnesses.

A.  The Declarations of Sharon Jackson (Doc. 82-3) and Angela Jackson (Doc. 82-4), and the Affidavit of Katrina Cosby (Doc. 82-8)

The Board objects to these declarations because, among other reasons, the Plaintiffs failed to disclose their names as witnesses in response to question 3 in the interrogatories, which requested that they identify every witness with knowledge of the circumstances made the basis of this suit.  Further, the Board stated that the Plaintiffs failed to mention these three people as witnesses when asked to do so in deposition testimony.  In their response to the motion to strike, the Plaintiffs do not deny that they failed to list Sharon Jackson, Angela Jackson, and Katrina Cosby as a possible witnesses.

According to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure, each party is required to provide to the other parties "the name, and, if known, the address and phone number of each individual likely to have discoverable information ...." Fed. R. Civ. P 26(a)(1)(A).  Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

If Plaintiffs desired to use these three individuals as witnesses, they should have apprised the Board of that fact by including them in Initial Disclosures or on the witness list that the Board requested by interrogatory.  Or, if the Plaintiffs did not initially know that these people had

5

relevant information, they should have supplemented that list when they discovered such information.  The Plaintiffs cannot wait until after discovery is closed and then rely on witnesses at summary judgment whom the Plaintiffs had not identified; the Board was not expecting that reliance and had no reasonable opportunity to depose them in the instant case.  The Plaintiffs have not shown where the failure to disclose Sharon Jackson, Angela Jackson, and/or Katrina Cosby was substantially justified or harmless.

Under these circumstances, pursuant to Rule 37(c)(1), the court will not allow the testimony of these three witnesses to be used at this summary judgment stage; the court WILL GRANT the motion as to their testimony and WILL STRIKE the declarations of Sharon and Angela Jackson and the affidavit of Katrina Cosby.

### B.  The Declaration of Andrea Stallings with Attached Timesheets  (Doc. 81-11 & 81-12)

The Board requests that the declaration of Plaintiff Stallings given in the related *Banks* case in 2013 be stricken because Stallings gave a thorough deposition in the instant case in 2014, and that the declaration is self-serving and overbroad.  Ms. Stallings originally gave this declaration in the *Banks* case, which was filed just over a year before the *Murray* case. The Plaintiffs responded that the declaration is dated a year before her deposition in the instant case and "could not possibly contradict the deposition which was taken one year later."  (Doc. 97, at 6).

The issue is not whether the declaration is dated before or after the deposition, because the Board does not specifically argue that the declaration is contrary to the deposition or is otherwise a sham concocted to create a genuine issue of material fact after the taking of a deposition in the instant case.  Rather, the issue, based on the Board's objection, is whether a

6

party is precluded from using her declaration testimony simply because it was given in another case against the same Defendant, when she has also given a thorough deposition in the case at bar.  Rule 56(c), which addresses the use of depositions and other testimony to support factual positions at the summary judgment stage, does not preclude the reliance on testimony given in another case when the same declarant has given deposition testimony in the instant case, and the Board does not point this court to any federal rule or federal caselaw that precludes such testimony or reliance on it.

The Board generally objects that the declaration is "self-serving and over broad" but does not specify how it is over broad and what particular language in the declaration is objectionable. If Ms. Stallings's declaration testimony in the *Banks* case about her work had focused on a certain time period that did not include the relevant time period in the *Murray* case, then an objection about its breadth and time frame could be well-taken.  However, the date of Ms. Stallings's declaration was January 4, 2013, a few months before this action was filed on May 1, 2013, and she testified to work schedules and work policies that were consistent during her tenure as a Child Nutrition Program Manager employee of the Birmingham Board of Education.  Therefore, her testimony would include much of the relevant period for this suit.  To the extent, if any, that the testimony covers additional time periods and information irrelevant or improper for the instant case, the court is capable of disregarding that information for summary judgment purposes.  Further, the characterization of testimony as "self serving" is not alone grounds to strike it.  *See generally Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").

7

The court notes that the same counsel represent the Board in both the instant case and the *Banks* case.  The Board has not specifically alleged that the Plaintiffs failed to disclose this document in Initial Disclosures or as a response to discovery requests; it has not characterized this declaration as an unfair surprise.

Based on the limited information presented in the motion, the court FINDS that the Board has not established that the entire declaration is due to be stricken, and WILL DENY the motion as to Stallings's declaration.

As for the timesheets, the Board requests that the first two pages of document 81-12 be stricken because they are for the time period of April 2010, which is outside the relevant time period here, beginning either on May 1, 2010 or May 1, 2011, depending on the resolution of the willfulness issue.   The court's review of document 81-12 confirms that the first two pages concern Stallings's time from April of 2010.  Accordingly, the court WILL GRANT the motion as to pages one and two of document 81-12, and WILL STRIKE those pages, but the rest of that document remains.

C. Deposition of Dr. Craig Witherspoon (Doc. 82-5)

The Board requests that the court strike this deposition because (1) it was not given for the instant case but was given for the case of *Reynolds v. Birmingham Bd. of Educ.,* Case No. 2:10-CV-02963; (2) because, although the defendant in Reynolds is the same as here, counsel for the Board were not counsel in the *Reynolds* case and counsel do not know what time frame that case involves except that the time frame is different from the time frame relevant here; and (3) because the deposition references exhibits that are not attached to it in the record of this case. The Plaintiffs respond that they referred to the  *Reynolds* case in their Amended Complaint.

Neither party advised the court whether the Plaintiffs had disclosed that they would be relying on this document in discovery responses or in Rule 26 responses.

Part of the court's analysis regarding whether such a deposition can be used is whether the deposition testimony would be admissible in evidence.  Fed. R. Civ. P. 32 (a) (1 & 3).  Rule 32, entitled "Using Depositions in Court Proceedings," provides that an adverse party may use for any purpose the deposition of a party's officer, director, or managing agent, provided that the party against whom it is admitted "was present or represented at the taking of the deposition or had reasonable notice of it." Rule 32(a)(8), entitled "Deposition Taken in an Earlier Action," provides that such a deposition "may be used in a later action involving the same subject matter between the same parties ... to the same extent as if taken in the later action.  A deposition previously taken may also be used as allowed by the Federal Rules of Evidence."  Fed. R. Civ. P. 32(a)(8).   Further, Rule 804 of the Federal Rules of Evidence provides that deposition testimony is an exception to hearsay and admissible "whether given during the current proceeding or a different one" when the deponent is unavailable and the party against whom the testimony is offered had "an opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination."  Fed. R. Evid. 804(b)(1).

At the time of the challenged deposition offered in the instant case, the deponent, Dr. Witherspoon, was an officer of the Board, and the Board was represented at the taking of that deposition, so the court FINDS that Rule 32(a)(1) and (3) would apply.   The Eleventh Circuit has previously affirmed a district court's consideration of deposition testimony given in a separate litigation under similar circumstances. *The Nippon Credit Bank , Ltd. v. Matthews,* 291 F.3d 738, 750-51 (11th Cir. 2002), *abrogated on other grounds by Diamond Crystal Brands, Inc.*

*v. Food Movers Int'l, Inc.,* 593 F.3d 1249 (11th Cir. 2010). The Court of Appeals found that the district court did not err by considering at the summary judgment stage depositions taken in a separate proceeding. The Court of Appeals cited both Rule 32(a) of the Federal Rules of Civil Procedure and Rule 804(b)(1) of the Federal Rules of Evidence, explaining: "[a] deposition taken in a different proceeding is admissible if the party against whom it is offered was provided with an opportunity to examine the deponent." 291 F.3d at 750-51.

The Board has not provided the court with a sufficient reason for striking the *entire* deposition of Dr. Witherspoon. The mere fact the deposition of the Board's superintendent was taken in another lawsuit and defended by counsel who are not members of or associated with the Boardman, Carr law firm does not render the totality of the deposition testimony inadmissible, because the Board was a party and had an opportunity to be present at the deposition and develop the facts. The court recognizes that parts of Dr. Witherspoon's testimony may refer to facts that relate to a different time period or to facts that do not relate to this lawsuit, but the Board has failed to point to those specific facts. To the extent, if any, that the testimony relates to a time period not relevant to this case, or that the testimony is unclear because of the omission of exhibits, the court is capable of disregarding that part of the deposition.

Accordingly, the court FINDS that the use of the deposition at the summary judgment stage meets Rule 32(a)(1 & 3) and 56(c) of the Federal Rules of Civil Procedure and Rule 804(b)(1) of the Federal Rules of Evidence; the court DENIES the motion to strike as to Dr. Witherspoon's deposition as a whole.

D.  Affidavit of Bridgette Jackson (doc. 82-1)

In addition to the inappropriate objection that this Plaintiff was not disclosed as a potential witness, the Board requests that the court strike this affidavit because the Board did not have the opportunity to take her deposition.  The court recognizes the unfairness of allowing Ms. Jackson to file an affidavit to present evidence in her favor when she repeatedly failed to show up at her depositions that the Board noticed, and, in any case, the court has dismissed her claims because of her failure to prosecute them.  (Docs. 129 & 137).  The court WILL GRANT the motion to strike as to Ms. Jackson's affidavit.

### III.  MOTION FOR SUMMARY JUDGMENT

The Board argues that this court should grant summary judgment in its favor on all claims for the following reasons: (1) as to the claims that the Board failed to pay for work performed in excess of scheduled hours but not greater that 40 hours per week, the FLSA requirements for overtime compensation do not cover such claims; (2) as to all other claims of overtime, the Plaintiffs have not established that they worked overtime without overtime compensation and have not established that the  Board had knowledge, or should have had knowledge, that they worked overtime; and (3) as to the claims for willful violations of the FLSA, the Plaintiffs have not established that a genuine issue of material fact exists that their conduct falls within the definition of willfulness.

### A.  Legal Standard on a Motion for Summary Judgment

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a

district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Mere disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory

Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very

mission of summary judgment procedure is to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.").  "The non-moving party need not present

evidence in a form admissible at trial." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274,

1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).

In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and

inferences drawn from the underlying facts must be viewed in the light most favorable to the

non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the

benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255.

Even if a district court "'believes that the evidence presented by one side is of doubtful

veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v.
Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving
statements made in sworn testimony simply because they are self-serving at the summary
judgment stage, and if the self-serving statements create a genuine issue of material fact, the
court should deny summary judgment on that basis. *Id.* at 1253.  After both parties have
addressed the motion for summary judgment, the court must grant the motion *if* no genuine
issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56.

### B.  FLSA Law

#### 1.  Elements of an FLSA Claim for Overtime

In the instant case, the Plaintiffs allege that the Board violated the FLSA in failing to
compensate them for overtime work.  To prevail on an FLSA claim for overtime, a plaintiff
"must demonstrate that (1) he or she worked overtime without compensation and (2) the Board
knew or should have known of the overtime work." *Allen,* 495 F.3d at 1314-15.

##### a. Overtime Worked

As to the first element, the FLSA requires employers to provide compensation at 1 ½
times an employee's regular rate of pay for all hours they are "[e]mployed" over 40 hours in a
work week. 29 U.S.C. § 207(a)(1).  "A person is employed if he or she is suffered or permitted to
work." *Allen v. Bd. of Public Educ. for Bibb Cty.,* 495 F.3d 1306, 1314 (11th Cir. 2007) (citing
29 U.S.C. § 203(g)).  "[I]f the employer knows or has reason to believe that the employee
continues to work, the additional hours must be counted." *Reich v. Dep't of Conservation & Nat.
Res.,* 28 F.3d 1076, 1082 (11th Cir. 1994) (citing C.F.R. § 785.11)).

The Supreme Court of the United States has explained that although Plaintiffs in an FLSA case bear the burden of proving that they worked overtime without compensation, "[t]he remedial nature of this statue and the great public policy which it embodies ... militate against making that burden an impossible hurdle for the employee." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946)*, superceded by the Portal-to-Portal Act[3] as recognized in Integrity Staffing So., Inc. v. Busk,* 135 S. Ct. 513, 516 (2014).  The employer has a duty to keep records of the employee's wages and hours, and "[e]mployees seldom keep such records themselves."  *Id.*

The Supreme Court in *Anderson* stated that if an employer has failed to keep accurate records and if the employee cannot offer "convincing substitutes,"

> [t]he solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

328 U.S. at 687.

Thus, in circumstances where the employer's records are not accurate—whether because it has failed to keep records or because the records it kept cannot be trusted—and where the employee lacks documentation, the Supreme Court held in *Anderson*  "that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.*  The burden then shifts from the employee to the employer: the employer must present either evidence "of the precise amount of

---

[3] That act does not call into question the Supreme Court's findings addressed in this Memorandum Opinion.

work performed" or evidence that negates "the reasonableness of the inference to be drawn from the employee's evidence." *Id.* " If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

> b. *Notice*

The second element of an FLSA overtime case is notice; the Plaintiffs must show that the Board knew or should have known of the uncompensated overtime work. They may establish this element by raising a genuine issue of material fact that the Board had actual or constructive knowledge of such work.

The Eleventh Circuit has explained that, in an FLSA case requiring such notice, "[k]nowledge may be imputed to the employer when its supervisors or management 'encourage [ ] artificially low reporting.'" *Bailey v. TitleMax of Ga., Inc.,* 776 F.3d 797, 801 (11th Cir. 2015) (citing *Allen*, 495 F.3d at 1314-15 and *Brennan v. Gen. Motors Acceptance Corp.,* 482 F.2d 825, 828 (5th Cir. 1973)). Similarly, the prior Fifth Circuit stated that a "company cannot disclaim knowledge" when immediate supervisors "squelched truthful responses" regarding the number of hours actually worked, even when the company's "upper management regularly encouraged the full reporting of overtime." *Brennan,* 482 F.2d at 827-28.[4]

Thus, when an employee of a county school board presented evidence of her supervisor's awareness of overtime worked without overtime pay, the Eleventh Circuit imputed the supervisor's knowledge to the employer board and found that the evidence created a genuine issue of material fact as to the board's actual knowledge of the overtime violation. *Allen*, 495

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

F.3d at 1318-19.  Consistent with those rulings, the Eleventh Circuit recently found that when evidence reflected that the supervisor "encouraged artificially low reporting by explicitly instructing [the employee] to underreport his time by working off the clock" and also "squelched truthful timekeeping by changing [ ] time records to show fewer hours worked," the employee had presented sufficient evidence of notice to survive the employer's summary judgment motion. *Bailey*, 776 F.3d at 801 & 805.

The Plaintiffs can also establish the element of notice by creating a genuine issue of fact that the Board *should have known* of the uncompensated overtime work.  "An employer is said to have constructive knowledge of its employee's overtime work when it has reason to believe that its employee is working beyond his shift." *Allen,* 495 F.3d at 1319 (citing 29 C.F.R. § 1785.11. The court measures the employer's knowledge "in accordance with his 'duty ... to inquire into the conditions prevailing in his business.'" *Id. (*quoting *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 512 (5th Cir. 1969)).  Although no FLSA violation exists "where the employee performs uncompensated work but deliberately prevents his or her employer from learning of it," the employer cannot claim it did not know about the overtime work when its "actions squelch truthful reports or where the employer encourages artificially low reporting." *Allen,* 495 F.3d at 1319.

### 2.  Equitable Defenses

An employer may not successfully assert an equitable defense to bar an FLSA action based on the employee's intentional underreporting of work hours where the employer knew or had reason to know of that underreporting.  Applying equitable defenses under such circumstances would undermine the Act's deterrent purpose.  *Allen*, 495 F.3d at 804-805.

<u>3.  Relevant Time Period: Willful or Not</u>?

The relevant time period of the FLSA case is either two or three years prior to the date of filing, depending upon whether a plaintiff can establish that the violation was willful:  a cause of action arising out of a willful violation may be brought within three years after the action's accrual, whereas the ordinary statute of limitations in cases brought under the FLSA is two years. 29 U.S.C.  § 255(a).

"To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1162-63 (11th Cir. 2008).  Showing reckless disregard is the "failure to make adequate inquiry into whether conduct is in compliance with the Act."  5 C.F.R. § 551.104.   A willful violation of the FLSA exists when the employer "'disregarded the very possibility that it was violating the statute.'"   *Allen,* , 495 F.3d at 1323-24 (quoting *Alvarez v. IBP, Inc.,* 339 F.3d 894, 908-09 (9th Cir. 2003) (internal quotations omitted)).   "The determination of willfulness is 'a mixed question of law and fact.'" *Id.* (quoting *Alvarez,* 339 F.3d at 908).

## **C.  Facts and Analysis**

All of the Plaintiffs in this case worked at various schools in the Birmingham City School System and claim violations of the FLSA's overtime requirements.  They claim that the Board's official timesheets regarding their work hours were inaccurate because the Plaintiffs worked off-the-clock and because school management edited their timesheets to report fewer hours than they actually worked.  They further claim that the Board knew or should have known about their true

work hours because their supervisors had such knowledge.  Although Plaintiff Murray was a custodian and Plaintiff Scott was a bookkeeper, the other Plaintiffs worked in lunchrooms as part of the Child Nutrition Program ("CNP"), either as managers or as CNP workers.

### 1.  Board Time-Keeping and Overtime Policies

The official policy of the Birmingham Board of Education is to pay overtime in compliance with the FLSA.  (Doc. 50-1, at 5 ¶ 10 & at 8).  Policy 3060 from the Board of Education's employee policy manuals, approved in 1996 and revised in 2004, states that non-exempt employees "shall be scheduled for overtime work only with the prior approval of the employee's direct supervisor *and* the Superintendent." (Doc. 50-1, at 7) (emphasis added). Policy 3.8.5 from the Board's policy manual, approved November 13, 2012, states that "[n]on-exempt employees are not authorized to work more than forty (40) hours in a workweek without specific direction or authorization to do so by the Superintendent, the employee's supervisor, *or* the supervising school principal."  (Doc. 50-1, at 8) (emphasis added).  Neither the page of the policy manual reflecting the approval of the November 2012 policy nor the affidavit of Craig Witherspoon, attaching pages with policies 3060 and 3.8.5, specifically acknowledged the conflict between the two policies or specifically stated that the November 2012 policy superceded the earlier policy.  However, the policy approved in 2012 would allow an employee to work overtime with the pre-approval of her supervisor or principal even if the Superintendent had not concurred with that approval.  Regardless, the apparent *practice* in the relevant time period was to require the Superintendent's pre-approval before working overtime.

The record reflects numerous memoranda from Birmingham City Schools superintendents and other administrators to city school principals, directors, supervisors, and

coordinators regarding overtime plans.  On January 16, 2008, Arthur Watts, Jr., the Chief

Financial Officer sent a memo entitled "Changing Time," confirming the FLSA requirements to

pay an employee for actual time served; directing school leadership to stop adjusting employees'

times to subtract time when they have already worked beyond scheduled hours; and "strongly

sugges[ting]" that principals and supervisors monitor the timesheets of all non-exempt

employees on a daily basis to ensure compliance.  (Doc. 50-3, at 6).

On March 6, 2008, in a memo entitled "OVERTIME PLAN," Acting Superintendent

Barbara Allen stated that the following overtime plan was effective immediately:

> The Fair Labor Standards Act set basic wage and overtime pay standards.  The
> district is required to pay a non-exempt employee time-and-a-half for work that
> exceeds 40 hours during a workweek.  **Please Do Not Allow Non-Exempt**
> **Employees to Clock-Out and Remain Working And Do Not Allow Non-**
> **Exempt Employees to Take Work Home!!!**
> * * *
> **All employees who serve in a supervisory capacity shall acknowledge and**
> **adhere to the following:**
> * * *
> 2.  **OVERTIME MUST BE PRE-APPROVED BY THE**
> **SUPERINTENDENT.**  If a situation arises where there is a need for overtime,
> the supervisor shall submit a request for overtime to his/her direct report.  The
> overtime request shall be approved by all direct reports and finally by the
> Superintendent.
> * * *

(Doc. 50-3, at 8) (emphasis in original).   Also part of that March 2008 memorandum was a sheet

that contained the following statements:

> If a Principal or Department Head allows an employee to work overtime without
> allowing the employees to be paid, then he/she *Shall Be Held Personally*
> *Responsible.*  Disciplinary actions will be accessed [sic], immediately.  Again,
> overtime must be pre-approved.

(Doc. 50-3, at 9).

On July 21, 2013, Dr. Witherspoon advised officers, directors, coordinators, and principals in the school system by written memorandum regarding an overtime plan effective immediately. That plan confirmed the Board's obligation under the FLSA to pay non-exempt employees time-and-a-half for work exceeding 40 hours per week, and reiterated the March 6, 2008 directive: "Do not allow non-exempt employees to clock-out and remain working and do not allow non-exempt employees to take work home." (Doc. 50-1, at 9).

The Board provided training sessions on FLSA for supervisors and required directors and principals to sign a statement in 2013 that reiterated much of the language in the March 2008 memo. The 2013 statement read in pertinent part as follows:

I, _____, have read and fully understand the procedure for overtime expenditures as these relate to the Fair Labor Standards Act and Birmingham City Schools policy. I understand that in my supervisory position I will acknowledge and adhere to the following:
***

> 2. Overtime must be pre-approved by the superintendent or his designee. The supervisor shall submit a request for overtime to his/her direct report. The overtime request shall be approved by all direct reports and final [sic] by the Superintendent or his designee.
> 3. The request for overtime should include the following: (1) name of employee(s) performing the services, (b) date(s) for which overtime is requested, (c) estimated number of hours to be worked, (d) type of work to be performed with signature of all direct reports, including the Superintendent or his designee.
> 4. Request should be submitted one week prior to needed overtime. Extenuating circumstances will be considered, but only if it meets the criteria for emergency relating to the health and safety of students/staff.

If a principal or Department Head allows an employee to work overtime without prior approval, the principal/department head shall be held personally responsible. Disciplinary actions will be assessed immediately.

Doc. 50-1, Att. 3 at 10-11.

21

Neither the statement nor Dr. Witherspoon's affidavit explains the conflict between this requirement that the superintendent approve all overtime in advance versus the November 2012 written policy allowing other school supervisors to approve all overtime in advance.

### 2.  Time Keeping Records

To maintain a precise record of employees' time worked, the Board implemented the Employee Attendance Management System ("EAMS"), approved for all schools in 2006.  The system involved a hand scanner, which each employee is required to use to scan in when they begin work and scan out when they stop.  The monthly timesheet generated by the scans shows "regular hours" as the hours the employee is scheduled to work; "straight time" as the time over scheduled hours up to 40 hours per week when the employee is scheduled to work less than 40 hours per week; "overtime" as the hours over 40 that the employee works per week; and vacation, sick leave, and holiday pay.  The monthly timesheet was presented to each employee on a monthly basis for his or her signature under the words: "I agree this accurately reflects my time and I have not been requested to falsify this timesheet." Each employee's supervisor also reviewed timesheets and signed them as well, agreeing to their accuracy.  The timesheets were then sent to the Board's Payroll Department for payroll processing, and paychecks were issued based on the time reported.

However, despite the signed agreement at the bottom of each timesheet, the Plaintiffs testified that the monthly timesheet they signed was not an accurate reflection of the time actually worked, either because they worked "off-the-clock" or because the scanned times had received edits, or both.  They claim that they signed their timesheets because they understood that signing them was the only way that they would receive their pay; that they feared contesting them would

22

endanger their job; and/or that the Board would not pay overtime even if they had worked hours

to earn it.  Although the record does not always include copies of checks, pay stubs, or other

payment documents other than the signed timesheets, most Plaintiffs acknowledged that the

Board issued paychecks to each employee based on the time and applicable leave reported on the

signed timesheets.  Mr. Murray is an exception; he testified that, before January of 2014, even if

his timesheets reflected overtime earned, he received payment for his regular wage without

payment either for overtime listed on the timesheets or overtime worked off-the-clock.  (Murray

Dep. Doc. 39-10, pp. 68-69 & 87).

*a. Edited Timesheets*

With some exceptions, the Board's signed monthly timesheets generally reflected round

daily hours: 6 for those scheduled to work 6 hours, 7 hours for 7-hour-per-day employees, and 8

hours for those who were scheduled to work a 40-hour week.

Some of the Plaintiffs presented archived unsigned timesheets that showed the actual

scanned times with supervisor edits, which generally edited the scanned time to the rounded

hours scheduled.  Sometimes the edits only changed a few minutes to obtain the round numbers,

but many of the actual scanned times showed repeated, substantial edits.  This opinion will deal

more specifically with those edits later as they relate to individual Plaintiffs.

(1) Punch Additions & Subtractions with [0]

Generally, the archived unsigned timesheets showed numerous "punch" additions through

"supervisor edits" that could show that Plaintiffs simply forgot to scan in or out.  But those

additions are also consistent with the Plaintiffs' testimony, which this court must accept at this

stage, that they frequently did not take lunch breaks because they were too busy to do so and that

the reason they sometimes forgot to scan in or out at the beginning and end of the day was that they were working before and after the scheduled work times.

When an employee scanned in or out, the scan reflected the employee's designated number next to the scan time in brackets; however, when a supervisor/bookkeeper added the time punch without an employee scan, the time on both the archived unsigned timesheets and the monthly signed timesheets shows a [0].

(2) Transferred Time with no [0]

The archived unsigned timesheets also reflected edits that occurred even when the Plaintiff *did* scan in and out: edits "transferring" time from the actual time scanned to another time.  Put another way, the "transferred" time in fact *altered* a time actually scanned with the employee's scan number and changed it to another different time that the editor recorded, still retaining the employee's scan number.   And, most troubling, because the "transferred" time edit retains the scan number of the employee, the alteration is invisible on the official signed timesheets; no [0] marks the alteration.  Although some of the transferred edits are *de minimis,* some of these transferred edits subtracted substantial time from the employee's scanned time—as much as thirty minutes to an hour—and support testimony from many Plaintiffs that they worked more than *de minimis* extra time that is not reflected on the official signed timesheet upon which their pay was based.  Because the scan numbers correlated to each employee, and another employee cannot scan in or out for someone else, this evidence reflects that the Plaintiffs must have been present at the actual scanned times listed on the archived unsigned timesheet at the beginning and end of the day, and yet, those times were sometimes edited to take away minutes from the Plaintiffs.  The archived unsigned timesheet showed the transfer/alteration in the edit

24

section at the bottom of the timesheets, but the resulting official timesheets that the Plaintiffs signed and from which they were paid, did not reflect the transfer at all; the number in brackets next to the *altered* time is the employee's number and not a [0], *as if* it reflected the actual time the employee scanned in or out when in fact it reflected the altered time.

### b. Working Off-the-Clock

The Plaintiffs also testified that the timesheets did not accurately reflect the time they worked because their supervisors directed them to work off-the-clock, working in the morning before they scanned in for the day, scanning in and out for lunch break even though they worked all or part of the break, and scanning out for the day before completing their chores. Some supervisors testified that they directed their supervisees to take breaks and that those employees did so. Other supervisors acknowledged that they knew the employees in their charge did not take lunch breaks or did not take the full breaks because they were unable to complete the necessary tasks if they did so. Some of these supervisors further acknowledged that employees scanned out and in for breaks to make sure the timesheets reflected the break and scanned out at the end of the scheduled work day, but then worked "off the clock" to complete their tasks.

Some Plaintiffs who were CNP managers testified not only that their employees worked off-the-clock but that they did themselves. CNP managers also testified that they were not paid for the time they took paperwork home to complete or the time they spent to take lunchroom money to the bank daily after they had clocked out.

### c. Time of Individual Plaintiffs and Burden of Proof

Prior to addressing the evidence regarding the time each individual Plaintiff's worked and making determinations regarding whether each has raised a genuine issue of material fact as to

overtime hours, the court must address the appropriate burden of proof as to evidence of overtime worked.  The Board asserts that, in light of its precise time records generated by employee hand scans, the court must require that Plaintiffs provide "definite and certain" direct evidence of overtime hours sufficient to counter those records; the Board insists that the Plaintiffs do not meet this burden of proof with their evidence of approximate hours worked.

On the other hand, the Plaintiffs argue that this court should apply the more relaxed burden stated in the Supreme Court's decision of *Anderson v. Mt. Clemens Pottery Co.,* requiring only that they present evidence showing "the amount and extent of that work as a matter of just and reasonable inference."  328 U.S. 680, 687 (1946).  The Supreme Court has explained that the more relaxed burden is appropriate in circumstances where the employer's records are not accurate, whether because it has failed to keep records or because the records it kept cannot be trusted.  *Id.*

The Eleventh Circuit has spoken on this issue of the appropriate burden of proof, defeating the Board's argument in the instant case.  In *Allen v. Bd. of Public Educ. for Bibb Cty.*, the defendant Board made a similar but unsuccessful argument.  It asserted that the Court of Appeals should affirm summary judgment in its favor because the employees had not met their burden to counter the board's precise time records that showed no overtime work; the employees had provided evidence of approximations of overtime hours worked but no documents showing the precise overtime hours.   However, the Court of Appeals noted that "'employees seldom keep such records themselves.'"  *Id.*  (quoting *Anderson,* 328 U.S. at 687).  It determined that *Anderson's* relaxed burden of proof applied where the employees' deposition testimony called into question the board's records: they had testified that they "were told not to record their

26

overtime hours because the Board would not pay them overtime" and, when they did record overtime hours, they were told to "resubmit new time sheets that reflected their scheduled, not actual hours." *Id.*

Applying the decisions of *Allen* and *Anderson* compels a decision that the relaxed standard of proof applies to the instant case. The Plaintiffs' deposition testimony calls into question the trustworthiness of the Board's official timesheets; they testified that they worked off-the-clock at the direction of supervisors and that the schools adjusted their time scans to subtract time actually worked. The archived timesheets themselves raise questions about the reliability of the Board's time records, as described above, and support to some extent the Plaintiffs' testimony regarding the schools' adjustment of their time scans. Although none of the Plaintiffs produced documents showing the precise time actually worked, they testified about their daily custom and habit of arriving and departing work at a particular time and working a specified amount of time during the lunch break. The court FINDS that the Plaintiffs have each produced "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *See Anderson,* 328 U.S. at 687; *Allen,* 495 F.3d at 1317-18.

Having determined that the Plaintiffs have met their burden of producing sufficient evidence of hours worked, the court will next address whether that evidence raises a genuine issue of material fact that each Plaintiff worked more than 40 hours per work week during the relevant period without compensation.

1. **Clarence Batain**: Mr. Batain was a CNP worker at Minor School. His scheduled work hours ranged from 6 to 6 ½ hours per day. Based on his archived timesheets, his work schedule was as follows:

27

- May 2010 through August of 2012 - 6 ½ hours daily (7:00 AM-2PM, including a scheduled 30-minute break) and 32.5 hours weekly.
- September 2012 until his retirement in September of 2013 - 6 hours daily (7:30AM-2:00PM including a scheduled 30-minute break) and 30 hours weekly.

(Doc. 136-1).

Mr. Batain's signed timesheets are not part of the record.  However, the Board recently supplemented the record to include his archived unsigned timesheets dated May of 2010 through September of 2013, which were exhibits to his deposition but were not filed with the deposition. (Doc. 36-1).  Those archived timesheets reflected straight pay but no overtime pay and contained numerous supervisor edits.  Those edits included frequent additions of a 30-minute lunch break and some occasional transfers of time from the scan times[5].

Mr. Batain testified that the only time he worked off-the-clock was in the afternoon.  He testified that, in the mornings, when he worked at Minor, he would scan in and begin working (doc. 39-1 p. 14), and *if* he took a break, he would scan out and in (*id.* p. 17); however, he would scan out at his scheduled departure time at approximately 2:00PM and continue to work off-the-

---

[5]For example, even assuming that the supervisor's additions of morning punch-ins at 7:30AM were correct, during the week of September 10-14, 2012, the edits "transferred" a scan on Monday from 6:43AM to scheduled clock-in of 7:30AM (subtracting 47 minutes of work time); added a 30-minute break on Thursday (subtracting 30 minutes of work time); and made adjustments on Friday adding punches and transferring time that took away another 30 minutes. So, ignoring the additions of morning punch-ins, the edits lost him 2 hours and 15 minutes of time that week, but not enough to reach overtime.  (Doc. 136-1, at 23).

As another example, during the week of November 4-9, 2012, supervisor edits transferred three scan-in times at approximately 6:30AM to 7:30AM, subtracting approximately 3 hours from his time that week.  In addition, punch additions gave him 30-minute breaks each day for which he did not scan in and out.  Therefore, his adjusted time for the week was 26 hours but the actual scan time before edits would have been 31 hours and 53 minutes. (Doc. 136-1, at 27 ). This subtracted time was substantial but adding it back would not reach over 40 hours and would not entitle him to overtime.

clock until he finished, which he estimated to be 2:30PM[6] (*id.* p. 18).  Therefore, accepting Mr.

Batain's testimony at this summary judgment stage, the scan times reflected in the archived

timesheets with Batain's number should accurately reflect the times he arrived and times he took

lunch breaks *unless those scan times were adjusted by supervisor edits*. Because the court also

has the archived timesheets with the supervisor edits, that time can be reconstructed with a

degree of accuracy.

Accepting that testimony—accepting the morning and lunch break scans if they contained

Mr. Batain's number unadjusted by supervisor edits and accepting his testimony that he generally

worked until 2:30PM—results in the conclusion that Mr. Batain worked substantial straight time

in excess of his work schedule but no overtime.[7]

---

[6] Mr Batain repeatedly testified that he actually left work at approximately 2:30PM.  In his interrogatory response, he stated: "I was also told to clock out at 2:00 p.m. and continue working until all the work was done for the day.  I did not leave until 2:30 p.m. or later."  (Doc. 81-10, at 2).  In his deposition testimony, he stated that he clocked out about 2PM and usually worked 30 minutes off-the-clock afterwards.  (Doc. 39-1, p. 18:"It would be about 2:30 before I finished."; p. 27: discussing the amount of work for which he did not receive pay: "in the evenings, 30 minutes.").

[7] The court notes that Mr. Batain  stated one time in the same deposition that he started work at 6:00AM [Doc. 39-1,. p. 61].  However, he stated repeatedly elsewhere in that same deposition that he started work at 6:30AM at Minor and stated that he would take a bus that dropped him off nearby the school at 6:25AM (doc. 39-1 pp. 14, 16, 54-55).  He provided no explanation for the contradiction regarding start times when he had repeatedly testified elsewhere in the deposition that he started at 6:30AM .  He stated in his interrogatory response 5 that he began working at 7:00AM [Doc. 81-10].  Mr. Batain also stated elsewhere in his deposition that, in the mornings, he scanned in and began to work after scanning, so the archived time sheet scan time should be his correct work time unless supervisor edits changed it.  *Id.* p. 14. The archived timesheets do not show that Mr. Batain ever scanned in at or about 6:00AM during the relevant period.  The scans sometimes showed he scanned in shortly before 6:30AM.  Mr. Batain said that he used public transportation, and although Mr. Batain said that a bus dropped him off near the school at 6:25AM and 6:55AM, he did not mention an earlier bus that would allow him to start work at 6:00AM.  (*Id.* pp. 14-16).  As discussed in this opinion, assuming that he began working between 6:30AM and 7:00AM and left at 2:30PM, and considering his other times listed in the

Therefore, the court FINDS that Mr. Batain has not created a genuine issue of material fact of an FLSA overtime violation; the court WILL GRANT the motion for summary judgment as to Mr. Batain's claims.

       2. **Daryl Carr**:   Mr. Carr was a CNP worker at Hudson Middle School.  The unsigned archived timesheets reflected that Mr. Carr's scheduled varied as follows:

- from April through August 2011 -  6 ½ hours daily (8AM-3PM including a 30-minute break) and 32 ½ hours per week;
- from September through January 2012 - 6 hours daily (7:30AM-2:00PM, including a scheduled 30-minute break) and 30 hours weekly;
- from February through September 2012 - 6 ½ hours daily (7:30-2:30 PM, including a 30-minute break) and 32 ½ hours per week; and
- October 2012 through January 2013 -  7 hours daily (7AM-2:30PM including a scheduled 30-minute break) and 35 hours weekly.

(Doc. 136-2).

Mr. Carr testified that his supervisor "shifted my time around," so he sometimes worked before he scanned in[8] and before his scheduled commencement time (doc. 39-2, pp. 48, 75-76); that he scanned out for lunch break but continued working; and that when his shift ended at 2:30, he clocked out about the scheduled time but left for the day at approximately 3:15 or 3:30PM, or

---

*archived* timesheets during the same workweek, the weekly totals did not exceed 40 hours.

    To the extent that Mr. Batain's own testimony contradicted itself regarding the start time, the unexplained contradiction in his own testimony cannot create a genuine issue of material fact. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir. 1984); *see also Horn v. UPS, Inc.,* 433 F. App'x. 788, 796 (11th Cir. 2011).

    [8] He also responded "yes" to the question "Is it your testimony that you, in fact, worked from the time you got there and put your hand in the clock?" (Doc. 39-2, at 59).  However, that answer could also mean that he was agreeing that he worked from the time he got there.  The question did not specifically ask whether he always clocked in the moment he arrived, and he specifically testified that sometimes his manager would stop him at the clock, tell him not to clock in yet, but to do a task first and then she would tell him when to clock in. (*Id.* p. 48).  Those two answers are not necessarily contradictory.

an hour after his scheduled departure.  (*Id.* pp. 11, 19-20, 27-28).  Testifying about archived timesheet from September of 2012, Mr. Carr stated that the scans showing him generally arriving near 7:00AM were accurate, even though his scheduled time was 7:30AM; that he generally worked through the 30-minute lunch break, even though the timesheet shows he scanned out and in; and that he generally left about 3:30 even though the scans showed earlier times because he continued to work after scanning out for the day.  (Doc. 39-2, at 57-68).

Testifying about the archived timesheet for December of 2012, Mr. Carr testified that although the timesheet showed that he generally arrived at 7:00AM, scanned out and in for a 30-minute lunch, and scanned out from 2:33-3:11PM, the lunch and departure scans were not accurate; he continued to work off-the-clock for 30 minutes during lunch and after scanning out for the day.  (Doc. 39-2 pp. 75-79).  He testified that in December of 2012, when he was scheduled to work 7 hours a day and 35 hours per week, he worked a minimum of an hour after his scheduled departure time of 2:30PM, and often worked an hour-and-a-half to two hours after scanning out.  (*Id.* p. 77).

Based on this testimony that, at his manager's direction (doc. 39-2, p. 75), he began work sometimes at 7:00AM, sometimes at 7:15AM,  and sometimes worked off-the-clock before work, worked through lunch despite scanning out, and did not leave until 3:15 or 3:30PM even though he scanned out earlier, his testimony supports regularly working over 40 hours per week during certain periods.  Because he claims to have worked off-the-clock, the court must accept his testimony to the extent that it conflicts with the timesheets, and acknowledge the existence of a genuine issue material fact as to the time actually worked.  In addition, the scans on the archived timesheets support his testimony to this extent: they show, for example, that in August

and September of 2012 when he was a 6 ½-hour employee scheduled to work 7:30AM-2:30PM, he often scanned in closer to 7AM and often scanned out past 2:30PM.  (Doc. 136-2, at 11-12). As another example, in late 2012 and January of 2013,when he was a 7-hour employee, he regularly scanned out after his scheduled end time.  (*Id.* at 13-16 ).

Therefore, based on Mr. Carr's testimony, the court FINDS that Mr. Carr has created a genuine issue of material fact that he worked over 40 hours per work week without overtime pay.

3.  **Anita Clark**: Ms. Clark was a CNP Manager at Norwood Elementary and Barrett Elementary who was scheduled to work as follows:

- May of 2011 -  8 hours daily (6:30AM-2:30PM, including no break while at Norwood);

- 2011-2012 school year at Barrett - 8 hours daily (6:30AM-3:00PM including a scheduled 30-minute break).

(Doc. 38-33).

She testified that she regularly worked 15 minutes before and 30 minutes after her scheduled hours and did not receive a full 30-minute lunch break, often receiving no break at all. (Doc. 39-3, at 12, 18-21, 23).   She also testified that, before she moved to Barrett and before Ms. Michelle Sales, Director of the Child Nutrition Program, streamlined the ordering process on the computer, she took paperwork home two days each week and worked on it for 30 minutes, presumably each night[9] (*id.* pp. 38-40).  At Barrett, she did not take paperwork home, but she did go to the bank daily about 3:30 PM, a 20-25 minute trip *after* she clocked out.  At Norwood, she would go to the bank and back while still on the clock.  (*Id.* pp. 12-13, 43).

---

[9] Her testimony is not completely clear whether she spent 30 minutes per week or 30 minutes on each of the two nights she took work home per week: "When I take them home, it takes about 30 minutes."  (Doc. 39-3, p. 38).

Ms. Clark's signed timesheets occasionally reflected overtime, but did not show overtime as a daily occurrence; these timesheets reflected that Ms. Clark rarely scanned out for lunch, but, beginning in August of 2012, would simply show that she regularly scanned out in the evening 30 minutes earlier than her scheduled departure time.

An unexplained gap in the timesheets occurs for August  2011 through May 2012. The archived unsigned timesheets were provided only for four of the relevant months—November of 2011, March of 2012, June of 2013, and February of 2014—the first three of which have no corresponding signed timesheet in the record.  The archived timesheets primarily reflected supervisor edits adding daily punches in and out for lunch breaks; without those edits, the timesheets would reflect overtime of approximately 2 ½ hours per week.  (Doc. 81-16).  Ms. Clark testified that the secretary manipulated her time through supervisor edits to cut down or cut out overtime when she in fact earned it.  (Doc. 39-3 pp. 19-20, 23).

The court FINDS that she has raised a genuine issue of material fact that she worked over 40 hours per work week without overtime pay.

4. **Michelle Dunner**: Ms. Dunner was a CNP worker at West End Academy, who had the following scheduled hours:

- August 2011 & 2012-13 school year - 7 hours per day (6:30AM-2PM or 6:00 AM-1:30 PM, both schedules including a 30-minute break), 35 hours per work week;
- May through June 2010; February through July 2011 - 6 hours per day (7:00AM-1:30PM, including a 30-minute break) and 30 hours per work week;
- 2013-14 school year - 6 ½ hours per day (6:30 AM-1:30PM including a 30-minute break) and 32 ½ hours per work week.

(Doc. 38-34; Doc. 136-3).

Despite these official hours, she testified that she started work at 6:00AM and worked until 2:00PM nonstop, taking no lunch break:[10] a total of 40 hours per week.  (Doc. 39-5, pp. 19, 23, 25-27, 32, 43-50).  She testified that, at her supervisor's direction, she worked 30 minutes in the morning before clocking in, worked through lunch although she clocked out and in for lunch, and continued to work after clocking out for the day.  However, even adding the off-the-clock hours does not result in *more than* 40 hours per week.  (Doc. 39-5, pp. 23-24, 27, 44-45).

Her signed timesheets do not cover the 2011-12 school year, although her archived unsigned timesheets attached to Claudia Cochran's deposition include some months of that school year.  (Docs. 38-34; 136-3). The signed timesheets in later years reflected that she earned

---

[10] Although Ms. Dunner stated at one point in her deposition that she worked 54 hours of overtime per month, when further questioned, she repeatedly acknowledged that she worked from 6AM-2PM nonstop each day, which is 8 hours per day, 40 days per week.  Referring to the 54 hours of overtime figure, she stated: "Well, maybe I miscalculated it.  I had it wrong.  I'm sorry."  (Doc. 39-5, pp. 44-45, 48-50).  In her interrogatory responses, she stated that she arrived at 6:30,  and "worked through my entire lunch break at least 3 out of five days of the week" and "did not leave until 2 p.m."  She again stated in those interrogatory responses that she worked approximately 54 hours of overtime per month, but that total is contradicted by the specific information listed above, which was stated in the same interrogatory response.  She also stated in that same interrogatory response that she was acting manager for a period with extra duties when her school did not have a manager, but she did not specify the time period involved.  (Doc. 81-29, at 2, interrog. 5).  After testifying at least 10 times in her deposition (Doc. 39-5, pp 27, 28, 44, 45, 48, 49, 50, 79, 80) and also in her interrogatory answers that she actually stopped working each day at 2:00PM, Ms. Dunner stated once in her deposition testimony that 2:30PM was the "longest" that she left the West End premises. (Doc. 39-5, p. 80).

Given her repeated testimony in her deposition and in her sworn interrogatory answers that she stopped working at 2PM, the court reconciles this one statement by noting that her response about 2:30 being the "longest" was in response to the question about when she left the West End premises, which is different from when she stopped working.  In any event, to the extent that Ms. Dunner's own testimony contradicted itself regarding when she stopped work daily, the unexplained contradiction in her own testimony cannot create a genuine issue of material fact.  *See Van T. Junkins & Assocs.,* 736 F.2d at 657; *see also Horn,* 433 F. App'x. at 796.

straight time (working over her scheduled hours but not over 40 hours per week) but not overtime.  (Doc 38-34.).

However, the court notes that Ms. Dunner claimed that, during the leave of her supervisor, Claudia Cochran, she performed extra hours and tasks for three weeks to three months,[11]  such as opening and closing the lunchroom, making deposits, and taking home paperwork like production reports; while disputes of fact exist about whether and how long she performed these tasks, the court must view those disputes of fact in the light most favorable to Ms. Dunner and accept her testimony.

Although Ms. Dunner was unsure about the date of Ms. Cochran's leave and gave varying "guestimate" dates in her deposition testimony, Ms. Cochran testified that the event precipitating her leave occurred in June of 2010, so the leave would have occurred during the time period relevant to this lawsuit.  (Cochran Dep. Doc. 39-4, p. 65; Dunner Dep. Doc. 39-5, at 9-14, 16-17).  Accordingly, accepting Ms. Dunner's testimony for the purposes of summary judgment, the court FINDS that she raised a genuine issue of material fact that she worked over 40 hours per week without overtime pay *during the time period that she was acting CNP manager in Ms. Cochran's absence and took on managerial tasks that she performed after 2:00PM.*  However, as

_____

[11] Discussing when Ms. Dunner's supervisor, Ms. Cochran, took leave in 2010 and left her as the acting manager of the lunchroom,  Ms. Dunner responded: "Oh, it was around January of 2010 due to the manager when she was off due to a death in the family" and stated that Ms. Cochran was gone about three months.  (Doc. 39-5 pp. 9-10).  Shortly thereafter in the deposition, she testified that she took over as acting manager "around April or March." (Doc. 39-5 pp. 11-12).  At one point she stated that she performed as full acting manager for three weeks before the Board sent a substitute supply worker to manage the lunchroom and make the deposits and order the groceries (i.e. do the paperwork and deposits) (*Id.* p. 16, 18-19); and, at another point, Ms. Dunner said she herself did the job "off and on, but I did it for those two months. . . ." (*Id.* p. 16).

to all other relevant time periods, the court FINDS that she has not created a genuine issue of material fact of an FLSA overtime violation.

The court further notes that Ms. Dunner testified about her time at Lee Elementary, but that period must be before the relevant time period for this case, because the archived timesheets from the 2010-11 year reflected that her school was West End, and the later timesheets show the same school.

5. **Juanita Freeman**: Ms. Freeman was a CNP worker at Woodlawn High School during the relevant period.  Her timesheets in the record reflect that she was scheduled to work during the relevant time as follows:

- May of 2010 - 5 ½ hours per day (8:30AM-2:30PM, including a 30-minute break) and 27 ½ hours weekly;
- August through October 2010 & February 2011 -  6 hours per day (8:30AM-3:00PM, including a 30-minute break) and 30 hours per week;
- March 2011 through October 2012 - 6 ½ hours daily (from 7:30AM-2:30 PM, including a scheduled 30-minute break) and 32 ½ hours weekly;
- November 2012 through March 2014 - 6 hours daily (from 7:30AM - 2:00PM, including a 30 minute break).

(Doc. 136-4).

Ms. Freeman also testified that after Spring break in 2014, her hours changed to 8:30AM to 3:00PM (6 hours per day excluding the lunch break) (*id.* at 13-14).

Ms. Freeman testified in her deposition that, at least part of the time she worked under supervisor Priscilla Humphrey in May 2010 through May 2012, she was scheduled to work 7:30AM-2:30PM, but Ms. Humphrey changed the schedule and required her to come in at 7:00AM to help with cooking breakfast.  Thus, she was required to work 7 hours, excluding the 30-minute lunch break, even though her timesheets still showed her scheduled hours as 7:30AM-

36

2:30PM.  She came in as much as 10 to 15 minutes early before 7:00AM in the mornings and, occasionally, came in as early as 6:30AM to start breakfast when Ms. Humphrey was off work for the day and could not do so.[12]  (Doc. 39-6  pp. 41, 71, 78, 80, 82).  In her interrogatory responses she stated that she "arrived at 6:30 a.m. and began work [but was] not allowed to clock in until 7 o'clock a.m.[13]" (Doc. 81-27).

The archived timesheets beginning August of 2011 through May of 2012, which was apparently the end of the time when Ms. Humphrey supervised her, support her testimony that she regularly arrived about 7:00AM on most days: they showed that she scanned in about 7:00AM on every day but Wednesday, approximately 30 minutes prior to her scheduled start time, and that she scanned in at approximately 7:30AM on Wednesdays.  (Doc. 136-4, pp. 16-25).  Despite these timesheets showing 7:30AM arrival on Wednesdays, Ms. Freeman was not specifically asked about Wednesdays, and her testimony was that she arrived just before 7:00AM everyday; she did not state everyday except Wednesdays.  She also stated when adding up the extra time she worked that her schedule was "five days a week," with no exception on Wednesdays.  (*Id.* pp. 53, 71).

---

[12] Ms. Freeman testified that, during the time Ms. Humphrey was her manager, Ms. Humphrey asked Ms. Freeman to come in and start breakfast at 6:30AM on the days when Humphrey would be off and could not start the breakfast herself.   On those days, Ms. Freeman would arrive at 6:30AM, clock out at 2:00 PM, but continue to work until everything was clean. (Doc. 39-6, p. 81).

[13] However, in her interrogatory responses, Ms. Freeman stated that the days she arrived at 6:30AM were the days that her supervisor was off and she was taking her supervisor's place in starting breakfast, so she was instructed to scan in at 6:30AM when she arrived.  (Doc. 39-6, pp. 78-80).  The archived timesheets in the record do not show that Ms. Freeman ever scanned in at 6:30AM although they do show that someone else clocked her in at 6:31AM on March 12, 2012. (Doc. 136-4, at 23).

She testified at another point in her deposition that she has never gotten her full lunch break of 30 minutes while working for the Birmingham Board of Education, and often received 15 instead of 30 minutes of a true lunch break, although she was directed to scan out for lunch even when she continued to work on her break.  (Doc. 39-6 pp. 25-26, 59-60, 71-73, 93).  She further testified that she clocked out at 2:30PM at Ms. Humphrey's direction but left at 3:15 PM or "however long it took us to get through."  (Doc. 39-6, pp. 29, 41-63, 71 ).

Her testimony reflected that her actual work schedule of 6:45/50AM-3:15PM when she worked under Ms. Humphrey would have totaled more than 40 hours some weeks,[14] given that she claims to have worked at least 15 minutes of her break.  Based on her testimony, for summary judgment purposes, Ms. Freeman established that she worked more than 40 hours some weeks during the period under Ms. Humphrey when she began working at 6:30AM  and 6:45/50 AM and that she did not receive overtime pay during such weeks.

Under the supervision of Alice Ashford (2013-14: when she was scheduled to work 7:30AM - 2PM), Ms. Freeman testified that she worked off the clock only 10 minutes in the morning, and *part* of her lunch break but did not work off the clock at all in the afternoon, totaling at most 40 extra minutes per day off-the-clock per 6-hour scheduled work day.  (*Id.* pp. 25-26, 55-59).  Under the supervision of Ms. Patty (2012-13: when she was scheduled to work 7:30-2PM), Ms. Freeman testified that she worked a similar schedule: 10 minutes extra in the

---

[14] In her deposition testimony, Ms. Petelos added up Ms. Freeman's time and Ms. Freeman agreed that the total was less than 40 hours per week.  However, Ms. Petelos was assuming a 6.5 hour day with a 30-minute break, an extra 15 minutes in the morning and no more than 45 minutes extra in the afternoon.  Ms. Freeman had testified that part of the time she was scheduled to work a 7 1/2 hour day, or 7 hours with a 30 minute break.  Ms. Freeman had also testified that she was arriving 10-15 minutes early and was working 45 minutes *or more* after scheduled hours, and never received her full 30-minute break.  (Doc. 39-6, pp. 72-74, 94-96).

morning and no full break, but she would not work off-the-clock in the afternoon.   (*Id.* at 52, 54, 61).  Accordingly, the total off-the-clock time under Ms. Patty would be at most 40 minutes per 6-hour scheduled work day. Therefore, Freeman's testimony establishes that she would *not* be entitled to overtime for the periods that she worked under the supervision of Ms. Patty and Ms. Ashford.

Therefore, the court FINDS that she has raised a genuine issue of material fact that she worked overtime without overtime compensation for the relevant period when Ms. Priscilla Humphrey was her supervisor.  However, for all other relevant periods, the court FINDS that she has not raised a genuine issue of material fact of an FLSA overtime violation.

6.  **Tammra Harris:** Ms. Harris was a CNP worker at Woodlawn High School who was scheduled to work 6 hour days (8AM-2:30PM, including a 30-minute break) and 30 hour weeks. Her signed timesheets in the record reflected that she sometimes worked over her scheduled hours, but that she never worked more than 40 hours per week.  (Doc. 38-36 pp. 1-33).  Her archived unsigned timesheets in the record did not show substantial supervisor edits except: (1) October 2011, when the editor added a week worth of punches, and transferred time on departure scans, subtracting 16 minutes on October 17, 12 minutes on October 26 and 21 minutes on October 27 (doc. 136-5, at 9); and (2) November 2011, when the editor added one punch and transferred time scanning back in for breaks and for departure, subtracting time earned that varied from 5 minutes to 15 minutes (doc. 136-5, at 2). On four or five occasions, however, adjusting the scanned time to round out the timesheet hours enured to Ms. Harris's benefit. (Doc. 81-30).

Ms. Harris testified that she worked off-the-clock at her manager's direction about 15 minutes each morning, during most of her 30-minute lunch break, and for 30 minutes to an hour after she scanned out each afternoon.   (Doc. 39-7 pp. 11, 15-19, 57-58, 62, 72-73, 80; Doc. 81-31 at 2 (interrog. 5)).  Accepting her testimony, she worked at most an hour and 45 minutes off-the-clock each day, which would total up to 38 hours and 45 minutes per week, more hours than she was scheduled to work but less than 40 hours per work week.  The court FINDS that she has not raised a genuine issue of material fact of an FLSA overtime violation.

7.  **Andraina Henry:** Ms. Henry was a CNP worker at Hayes who was scheduled to work 6 hours per workday (7:30AM - 2PM, including a 30-minute break) and 30 hours per week.  Her signed timesheets reflected that she never worked overtime and occasionally worked straight time of an hour or less per day.  (Doc. 38-37).  The unsigned archived timesheets in the record reflected supervisor edits adding lunch breaks and arrival and departure punches where no scans existed but reflected no notable transferred time.[15]  (Doc. 81-18).

Ms. Henry testified in her deposition that she generally arrived 30 minutes early in the morning before her scheduled 7:30AM commencement time, and actually left in the afternoon 30 minutes to an hour after her scheduled time with no 30-minute break.  (Doc. 39-8, pp. 72, 77-81, 82).  Although she testified at one point that she sometimes worked until 3:00 PM, she also testified that she would leave work *every day* and go to the nearby house of a friend between 2:00PM and 3:00PM and sleep until her kids would be dismissed from school at 3:00 PM.  (*Id.* pp. 87-88).  In her interrogatory responses, she stated that she left each day at 2:30PM. (Doc. 81-

---

[15] On September 7, 2011, a supervisor edit moved time around but the end result did not subtract time.

19, at 2).   She estimated that most days she worked 7 ½ hours, which would total 35 hours per week and which coincides with her interrogatory answers that she worked from 7AM-2:30PM with no break.  (Doc. 39-8, at 44-45).

Even accepting Ms. Henry's testimony that she began working 30 minutes before her scheduled time and occasionally worked to 3PM without a break, the hours worked would total 40 hours per week but not more.  The court FINDS that she has not raised a genuine issue of material fact that she worked over 40 hours per work week.

8.  **Wanda Holt:** Ms. Holt was a CNP worker at Woodlawn High School, who was scheduled to work 6 hours per day (8:00AM-2:30PM, including a 30-minute break) and 30 hours per workweek.  (Doc. 136-7).  Her signed timesheets beginning in May of 2010 reflected that she normally worked exactly 6 hours per day, with no additional minutes, and occasionally worked straight time but never worked overtime.  (Doc. 50-52).  Her unsigned archived timesheets in the record reflected supervisor edits of occasional added punches where no scans existed and numerous instances of transferred time:

- May 28, 2010 (subtracting an hour from the departure time, which would not have entitled her to overtime);
- September 14 & 17, 2010 (subtracting less than 10 minutes each to reach the scheduled departure time);
- November 15 & 29, 2010 (subtracting 8 and 11 minutes respectively to reach the scheduled departure time);
-  December 6 & 7, 2010 (subtracting 11 and 13 respectively minutes to reach the scheduled scan in and out times);
- January 24 & 26, 2011 (subtracting 9 and 11 minutes respectively to reach the scheduled scan in times);
- February 7, 14 & 25, 2011 (subtracting 10 minutes each time from earned time);
- March 9, 2011 (subtracting 32 minutes from the departure time);
- August 18 & 24, 2011 (subtracting 8 minutes and 17 minutes respectively to reach the scheduled departure time); and

- September of 2011(which reflected almost daily edits from 4 minutes to 23 to round the scans to the scheduled departure times and to establish a full 30-minute break).

(Doc. 136-7 at 1, 5, 7-11, 16-17).  Rarely was the adjustment in Ms. Holt's favor.

Ms. Holt testified that she followed the following actual work schedule, working off-the-clock at her manager's direction:  she began working an hour before her scheduled time but scanned in at 7:30 or 8:00AM, did not receive her full 30-minute break even though she scanned in and out as if she did, and would scan out at 2:30PM but would work off the clock for about an hour afterwards, leaving about 3:30PM.  (Doc. 39-9 pp. 9, 11-13, 16-17, 21, 29-30, 50, 59; Doc. 81-33, at 2 interrog. 5).

Accepting her testimony as true, she generally worked over 2 hours per day in addition to her 6-hour scheduled workday (generally 8 ½ hours per day); the court FINDS that she raises a genuine issue of material fact that she worked more than 40 hours per work week without overtime compensation.

9.  **Tommy Murray:** Mr. Murray was one of the two Birmingham Board employees in this lawsuit who were not CNP workers or managers.  He was a custodian who worked at two different schools during the relevant time period, Oliver Elementary and Arrington Middle School.  Mr. Murray was scheduled to work the following hours:

- December 2010 and September 2013 through February 2014 - 8 hours per day (6:30AM-3:00PM, including a 30-minute break);
- January 2013 through August 16, 2013 - 8 hours per day (10:00AM-6:30PM, including a 30-minute break);
- July 2012 through November 9, 2012[16] - 8 ½ hours per day (6:30AM-3:30PM, including a 30 minute break).

---

[16] Mr. Murray was on vacation, administrative leave, and holiday leave from November 12, 2012 through January 1, 2013.

(Docs. 50-34 & 81-1).

Mr. Murray testified that, at all his jobs at the various schools in the Birmingham system, he usually arrived at 6:00AM.  He worked at the schools of Gate City and Oliver before January 2013, when he moved to Arrington Middle.  When he was working at Oliver, he would generally arrive at 5:45AM and open the school doors and leave between 3:30PM and 4:00PM, most often the latter.  He would clock out at 3:00PM and continue to work, and during some periods he had to lock up the school doors for the evening.

When he worked at Oliver through December of 2012, his principal allowed him to have an hour lunch break, but Mr. Murray testified that most of the time he actually took a break of 20-25 minutes instead of the full hour because he would be called during his break to perform tasks that interrupted his break.  (Doc. 39-10, pp. 11-12, 44, 86, 93).   His lunch break at Arrington was scheduled to be 30 minutes but it was often interrupted; he stated that "two or three times out of a week I get 15 minutes [of lunch break], if I get 15 minutes."  (*Id.* pp. 24-26, 41).  On other days, he did not eat at all but continued his tasks, and some days he was able to take a lunch break.  (*Id.* pp. 41-43). Mr. Murray clocked out for his lunch break and clocked back in 30 minutes later regardless of whether he actually took a true break; he did not ignore calls to work during his break, as he understood that the principal expected him to answer them and he did not want to be considered insubordinate, and he did not clock in and out each time he was interrupted while on break.  (*Id.*  pp. 51, 54-58, 60).

Mr. Murray also testified that he worked some Saturdays[17] without pay.  When he was at Oliver, he regularly worked Saturdays, because volunteers used the building on Saturdays and he would open the building for them and stay to close the building when they left.  (*Id.* pp. 45-48). At Arrington, he worked on Saturdays without pay because the principal "wants the floors done special," a task difficult to do when the kids are around, and the principal asked whether he could come in when the kids were gone to do it.  (*Id.* pp. 48).   He also worked occasional Sundays for an open house or when a maintenance problem arose like a water leak that occurred on the weekend.  (*Id.* p. 46-47).  On these weekends, he did not clock in because he was instructed at one point that "you can't clock-in because they ain't giving you no overtime if it hadn't been approved ahead of time."  (*Id.*  p. 45, 48).  Further, if one of the custodians was out for the day or for vacation, he was expected to do the absentee's work off-the-clock, because he was the head custodian ultimately responsible for ensuring that the building was clean, and he would be blamed if the building were not clean.

Before January of 2014, the principal questioned all overtime work, reminded Mr. Murray that the Board did not pay overtime, and Mr. Murray stated that when his archived timesheets would show overtime, the overtime would be ignored and his paycheck would not include the extra hours.  However, Mr. Murray had noticed a difference in applying the overtime policy since January 2014, which was after this suit was filed and was the year of his deposition. Mr. Murray stated that since January, he had started clocking out when he actually left the

---

[17] At one point, Mr. Murray stated that he would estimate that he worked two Saturdays a month.  At another, when talking about working at Oliver, he said that volunteers giving out bookbags and planting flowers would have meetings at the school "every Saturday," but then he said "like twice a month when they would come and bring stuff for the children, bags and clothes and food and stuff." (Doc. 39-10, pp. 45-48).

school, not his scheduled departure time, and that he had been receiving overtime pay.  (*Id.* p. 67-69, 85-86, 88).  He estimated that the number of unpaid hours he worked per month were about 40.  (*Id.* p. 89).  Mr. Murray's interrogatory answers are consistent with his deposition testimony. (Doc. 81-2).

The record reflected none of Mr. Murray's timesheets from 2010 through June of 2012. The signed timesheets from the Fall of 2012 before his leave time began reflected that he generally scanned in shortly before 6:30AM and scanned out between 3:30PM and 4:00PM, usually with scans reflecting an hour lunch break, and, once or twice a month, he would leave after 7:00PM.  (Doc. 50-34, at 2-6).  Those timesheets also showed that he worked an occasional Saturday and Sunday in August of 2012.  According to the timesheets, he worked 32.25 hours of overtime in August and September of 2012, and 6.50 hours in October of 2012, and 5.25 in November of 2012.  (*Id.*).  His timesheets listed two hours or less of overtime each month in the Spring of 2013.  (*Id.* at 9-14).  Beginning in August of 2013, his morning scan-in time varied from 6:00 to 7:00AM and his departure scan varied from close to 3:00PM to as late as 9:25PM. That Fall, the timesheets reflected overtime work that ranged from 97.75 hours in August of 2013 to 2 hours in October of that year.  In 2014, he usually scanned in near 6:00AM and scanned out between 3:30 and 4:00PM.  (*Id.* at 24-26).

The archived unsigned timesheets reflected only three months—December 2010, July 2013 and February 2014–and generally showed punch additions for lunch breaks but reflected no transferred time.  The month of December 2010 showed supervisor edits taking significant time away from his departure scan: 54 minutes on December 3 and 43 minutes from December 7.  The record does not contain November of 2010's timesheets, so the court does not have access to the

time scans for Monday, November 29, 2010 and Tuesday, November 30, 2010, but Wednesday December 1-3, 2010 all showed 8 hours of scanned work time per day, so the subtraction of close to an hour on December 3 may well have made the difference between regular pay and overtime. (Doc. 81-1). Mr. Murray testified that even when his timesheets showed overtime, he did not receive overtime pay.  (Murray Dep. Doc. 39-10, pp. 68-69 & 87).

The court FINDS that Mr. Murray's testimony raises a genuine issue of material fact that he worked more than 40 hours per work week without receiving overtime pay.

10.  **Geraldine Parker**: Ms. Parker was a CNP Manager who retired in 2007 but would fill in afterwards at various schools as a substitute.  In August 2012 through January 2013, she filled in as a substitute at the CNP Manager position for Lewis Elementary School, and timesheets reflected that she continued to work for the Board through May of 2013, either at Lewis or elsewhere; the timesheets do not reflect the location worked.  Ms. Parker was scheduled to work 8 hours per day: 6:30AM-3:00PM, including a 30-minute break.  The available signed timesheets from September 2012 to May 2013 reflected that she worked only 1 hour and 45 minutes of overtime during the school year, but the signed timesheets skipped some months in the Spring of 2013.  (Doc. 50-42, at 1-6).

The archived unsigned timesheets in the record only covered a few months: September through December 2012, January through May 2013 and December 2013.  Those archived records reflected almost daily punch additions and some transferred time, but many of the transferred time edits were in Ms. Parker's favor.  In October of 2012, the transfers subtracted significant time: for example, 31 minutes during October 8 and 9, 2012; and 54 minutes from October 16 through 18, 2012. (Doc. 81-14).  Because the official timesheets in October 2012

46

showed 40 hours of "regular" work and no overtime, these subtractions meant that her signed timesheets showed no overtime when her archived timesheets showed that her actual scanned time reflected overtime work.  (Doc. 38-40).

In December 2012, the transfers repeatedly took away time that was more than *de minimis*: 27 minutes on December 5; 13 minutes on December 6; 10 minutes for lunch and 16 minutes at the end of the day on December 11; 10 minutes for lunch and 20 minutes at the end of the day on December 13; 3 minutes at lunch and 8 minutes at the end of the day on December 17. (Doc. 81-14).  Those changes made a difference in the overtime threshold: the subtraction of 27 minutes on Wednesday, December 5, 2012 and the subtraction of 24 minutes on Thursday, December 6, 2012 (adding 11 minutes to the lunch break and subtracting 13 minutes from departure time) meant that the hours worked for the week of December 3-7, 2012, which had been adjusted to 39.75, would actually have been above 40.  Similarly, the transferred time (not counting added punches) for December 10-14, 2012 meant that the adjusted time of 40 hours would actually have been over 41.  (Docs. 81-14 & 38-40).

Ms. Parker testified that she arrived every day at 6:00AM and would clock in, when she remembered, at approximately 6:30AM, and then would work until 10 minutes after 4:00PM to get to the bank before it closed.  (Doc. 39-11, pp. 11-12).  She never had time to take a duty-free lunch break, but she would clock out and in and she would direct those under her supervision also to do so; however, she also told them that they had to complete their work before actually taking a break, so her workers did not always get breaks when they clocked out for lunch.  (*Id.* pp. 17-19, 47-49, 52).  Sometimes the grocery delivery would come at 3:00PM or after and she had to stay until the groceries were unloaded and would ask Willie Armstrong, one of her

47

workers, to stay late with her to unload even though she knew that they would not be paid for working overtime.   (*Id.* pp. 25-27).  Ms. Parker testified that sometimes she would take paperwork home, especially at the end of the month.  (*Id.* pp. 23-24).

Her interrogatory answers are largely consistent with her deposition testimony, except that, in her interrogatory answers she stated that she took paperwork home at least twice per week and worked approximately an hour each night on it.  She estimated that she worked approximately 12 hours per week for which she received no pay. (Doc. 81-15, at 2 interrog. 5).

The court FINDS that Ms. Parker has raised a genuine issue of material fact that she worked over 40 hours per work week without overtime pay.

11.  **Teresa Phillips:** Ms. Phillips was a CNP Manager who worked at Lewis Elementary School and Huffman Academy.  She was scheduled to work 8 hours per day (6:30AM to 3:00PM, including a 30-minute break).  Overtime "was always an ongoing situation ever since I have been [working for] the Board."  When she first worked at a school called Wright, she received a letter from the principal for her signature, advising employees that they would be "falsifying our time when we did overtime."  (Doc. 39-12, pp. 31).  Although that experience was prior to the time frame involved in this suit, that history emphasized her awareness that the Board had a policy of not paying overtime.

Ms. Phillips's complaints in this lawsuit appear to focus on her time as a CNP Manager at Lewis Elementary School, and, based on her testimony and the timesheets of record, her work at Lewis from May 2010 through August of 2012 would be within the relevant time frame.  Ms. Phillips testified that, when she worked at Lewis, she arrived at work at approximately 6:30AM and scanned in when she arrived, that she did not take a break for lunch even on the days she

scanned out and in, and that she left work at approximately 4:30PM.  (Doc. 39-12, pp. 14-20,

50).  She further claimed to take paperwork home with her "[m]ost days." (*Id.* p. 22).  During

that time period, she went to the bank to make daily deposits during school hours. Ms. Phillips

talked to her principal at Lewis about the difficulty of completing all CNP work within scheduled

hours without enough workers, and Principal Hunter responded that she could not do anything to

solve the problem and that Ms. Phillips would have to work with the area CNP supervisor.

However, the area supervisor did not send more CNP workers, either temporary or permanent, to

solve the overtime problem.  (*Id.* pp. 31-32).

   According to Ms. Phillips, during the months when she earned overtime at Lewis, she

signed two payroll sheets each month.  The bookkeeper would show her a sheet that reflected

overtime actually worked and ask her to sign the sheet, indicating that she understood that these

total hours would be changed because the Board did not pay overtime.  The second sheet she

signed would reflect her approval of pay for up to 40 hours per week with the overtime hours

removed.   The bookkeeper at Lewis showed Ms. Phillips that she put both timesheets, the one

reflecting overtime and the one with the overtime removed, in Ms. Phillips's file.  (*Id.* pp. 23-25,

43-44).

   Unfortunately, the signed timesheets of record included only one that purported to reflect

time at *Lewis*: August of 2012.  That timesheet reflected no overtime and the [0] next to lunch

break scans further reflected that she did not personally scan out and in for break, but that a half

an hour break was added each day for her.   (Doc. 38-38, at 22).  The parties pointed the court to

no archived unsigned timesheets from the relevant time period that are for Ms. Phillips's work at

Lewis.

At *Huffman Academy*, where she began working in September of 2012, she took her lunch break, and had enough workers that she did not need to stay over scheduled hours, or, on the occasion that a worker was missing and she stayed late, she was paid.  (*Id.* pp. 28 & 51). Since she began working at Huffman Academy, she stated that she has been paid overtime and she could not say that her timesheets were changed.  (*Id.* pp. 28, 45-46).  Her only testimony regarding off-the-clock work while at Huffman Academy related to making bank deposits.  The bank was located "half a block down the street" from Huffman Academy and she generally went to the bank after she scanned out for the day, although sometimes she took the deposit to the bank during work hours around 1:30PM.  (*Id.* pp. 42-43).

The signed timesheets at *Huffman Academy* range from  September of 2012 through January of 2014, the latest signed timesheet in the record.[18]  Those signed timesheets showed that she rarely scanned out and in for lunch during the 2012-2013 school year but did scan out and in most days for lunch break during the Fall semester of 2013 and January 2014.  The only archived unsigned timesheet in the record that is relevant to the time period involved in this lawsuit is for the month of October 2012, which showed added time punches in and out for every lunch break

---

[18] Her signed timesheets in the record, which begin in August of 2012, reflected that she very rarely scanned out and in for lunch breaks during the 2012-13 school year, although, in May of 2013, the supervisor edits added lunch breaks for her.  During the 2013-14 school year, she began to scan in and out for break often, and when she did not, supervisor edits added scans for those breaks. Her timesheets from 2012-13 reflected that she earned overtime many months: 9.25 hours in September of 2012; 6.5 hours in October of 2012; 12.50 in November of 2012; 9 hours in December of 2012; 10 hours in January of 2013; 5 hours in February of 2013; 4.75 in March of 2013; 9 hours in April of 2013; 1.75 in May of 2013.   (Doc. 38-38, at 11, 13-20, 23).   In 2013-14, her timesheets reflected that she earned the following overtime:  3.50 hours in October of 2013, 6 hours in November of 2013; 2.25 hours in December of 2013; and 1 hour  in January of 2014.  (*Id.* at 1-5, 6-9). However, the payroll adjustment sheet in the record for the 2013-14 school year does not clearly reflect overtime paid.  (Doc. 38-38, pp. 3-4).

during the month plus occasional time punches at the end of the work day. It also showed eight instances of transferred time: six to lengthen the lunch break approximately 5-10 minutes to ensure that the total time for the day was a round, even number (these edits did not appear to be designed to prevent reaching an overtime threshold, as Ms. Phillips was already working overtime); and two edits on October 18 changing the scan from 3:49PM to 3:15PM for a net subtraction of 35 minutes (which would have changed her overtime for the week from 2.5 to just over 3 hours).  (Doc. 81-22, at 9-10).

In sum, the timesheets, coupled with Ms. Phillips's testimony, reflected that the only unpaid overtime worked after her move to Huffman Academy in September of 2012 was the extra time required to take her daily trip to the bank, which was half of a block from the school. (Doc. 39-12, pp. 42-43).  At some point, Ms. Phillips testified that the Board paid her for "mileage" for going to the bank, but her testimony was not clear about whether she was referring to mileage for bank runs at Huffman Academy or Lewis or both; in any case, she did not testify that she received overtime pay for the daily bank trips. (Doc. 39-12, p. 34).  The record also has pay records for Ms. Phillips for the 2013-14 school year.  (Doc. 38-38, pp. 3-4).

Ms. Phillips's response to interrogatory 5 appeared to be a somewhat inconsistent combination of her deposition testimony regarding work at Lewis and Huffman Academy.  For example, the 6:30AM-4:30PM work hours, lack of break time, and taking paperwork home with her, as stated in response to interrogatory 5, are all consistent with her deposition testimony regarding her time at Lewis but not regarding Huffman Academy; that interrogatory response does not specify the time period or school involved.  However, the interrogatory response is not completely consistent with her testimony about Lewis, because the response stated that she took

51

the deposit to the bank off-the-clock when she left work, whereas the deposition testimony stated that "most of the time" while working at Lewis she made her daily deposits at the bank during working hours by 2:00PM and then returned to school.   She estimated in her interrogatory response that she worked approximately 48 hours per month of overtime for which she was not compensated, which corresponds more closely with her deposition testimony regarding her work performed at Lewis but not that at Huffman Academy.  (Doc. 81-23, at 2 interrog. 5; doc. 39-12, at 36).

The court FINDS that Ms. Phillips has raised genuine issues of material fact that she worked more than 40 hours per work week without overtime pay.

12.  **Andrea Scott:**  Ms. Scott was a Bookkeeper at Martha Gaskins School.  She is a salaried employee scheduled to work 7 ½ hours per day (7AM-3PM including a 30-minute break) and 37.5 hours per week.  Her signed timesheets reflected that she regularly earned overtime, much of it substantial.[19]

In addition to her regular Bookkeeper job, the Board paid her $14 per hour to work as a cashier one or two days per week during basketball season from about 4-9PM, handling ticket money for the high school basketball games of any of the Birmingham City schools.  The payment for basketball games came in a separate check from her regular paycheck.  For example,

---

[19]  The notations on the signed timesheets reflected that the straight time and overtime for Ms. Phillips was separated as "job" (bookkeeper work) and "gm" (game work).  For example, on her August 2012 timesheet, she earned 7.50 straight time hours, subdivided as 4 hours for her job and 3.5 hours for game work; and she earned 8.5 hours of overtime, subdivided as .5  for her job and 8 hours for game work. (Doc. 38-39, at 1).  As further examples, in September 2012, she earned 15.50 straight hours (3.50 job, 12.00 gm) and 18.50 overtime hours (gm); in October 2012, she earned 10 straight hours (.25 job, 12.00 gm) and 22.25 overtime hours (gm); in November 2012, she earned 12.25 straight hours (3 job, 9.5 gm) and 4.75 overtime hours (1.75 job, 3 gm). (Doc. 50-39, at 2-5).

if she worked 37.5 hours as a Bookkeeper per week, and additional hours as a game cashier, she would receive her normal salary plus $14 for each of the first 2 ½ hours that she worked as a game cashier until she reached a total of 40 hours, and then overtime of $21 (time-and-a-half based on $14 per hour) for each additional hours worked that week, if any. (Doc. 39-13, pp. 49-53).  She initially stated that she was not shorted any payment for basketball games worked, and acknowledged that she was paid overtime at the rate promised.[20]  (*Id.* p. 52).  Her FLSA claims are primarily focused on her Bookkeeper duties; she claims that she regularly worked as a Bookkeeper more than the 37.5 hours scheduled.

Ms. Scott testified that she usually arrived at work, scanned in, and started her duties between 6:45 and 6:50AM, but the scan would be changed to show that she arrived at 7AM. (Doc. 39-13, pp. 58-49, 62).  She scanned out and in for a 30-minute break regardless of whether she actually took the break.  She actually worked through her entire break about 2 days per week. On the other days, she often received a partial break but she had not received a full 30-minute duty-free break since she began working for the Birmingham Board.  (*Id.* pp. 62-63).  Even if she did not take a lunch break and did not scan out and in for the break, the secretary scanned her out and in for 30 minutes.  (*Id.* p. 19).

After Ms. Scott scanned out for the day at approximately 3PM, she went directly to the bank to make a daily deposit.  The bank was approximately 10 minutes in the opposite direction

---

[20] At one point during her deposition testimony, Ms. Phillips agreed with her lawyer that she should have been paid overtime for her basketball cashier work at the rate of $27.75 per hour (doc. 39-13, p. 69).  She later acknowledged that she always understood that she would be paid overtime for her cashier work at $21.00 per hour (*id.* p. 73) and did not know whether she should be paid $27.00 or $21.00 per hour for cashier work at the games (*id.* p. 78).  She never knew what her overtime rate at her Bookkeeper salary was supposed to be because she did not know what her salary rate would have translated to per hour.  (*Id.* p. 77).

from her home, so making the deposit took at least 20 minutes of her time off-the-clock after school.  (Doc. 39-13 pp. 13-15).  Therefore, in her deposition, she testified that the time she worked off the clock as a Bookkeeper most days was approximately 65 minutes, or just over 21.5 extra hours per month.  Those additional hours would mean that Ms. Scott regularly worked about 43 hours per workweek as a Bookkeeper.  (*Id.* p. 64).  Her interrogatory responses were generally consistent with that testimony.  (Doc. 81-31, at 2 interrog. 5).

The archived timesheets in the record included only three relevant months: August of 2012, June of 2013, and August of 2013.  The two August timesheets  reflected that Ms. Scott often arrived 10-15 minutes before her scheduled start time of 7:00AM, although she sometimes arrived a few minutes before or a few minutes after 7.  The supervisor edits for those three months did *not* subtract time when she arrived 10-15 minutes early and did not change her arrival time to 7AM, as Ms. Scott had suggested.  Most of the supervisor edits were to add a lunch break or to add game work in the August months.  The archived time sheets were not inconsistent with Ms. Scott's claims that she did not receive a full break, or any break some days, nor were they inconsistent with her testimony that she worked off-the-clock when she made daily bank deposits after leaving work.  (Doc. 81-34, at 3-5).

The court FINDS that Ms. Scott has raised a genuine issue of material fact that she worked more than 40 hours per work week without overtime pay.

13.  **Rhonda Smith:** Ms. Smith worked as a CNP Assistant Manager at Central Park Elementary.  She was scheduled to work various hours:

•      May 2010 through September 2010 - 6 hours per day (7:30AM-2PM, including a 30-minute lunch break);

54

- October 2010 - 7.5 hours per day (6:30AM-2:30PM, including a 30-minute lunch break); and
- November 2010 through March 2014 - 7 hours per day (6:30-2PM including a 30-minute lunch break).

The signed timesheets, which skip around somewhat, reflected no overtime work. (Doc. 38-41; Doc. 39-14 p. 26).

Because Ms. Smith testified that she scanned in when she arrived in the mornings and scanned out when she actually left for the day and did not work off-the-clock except at lunch, the court could reconstruct her work day by looking at the archived time sheets with supervisor edits. (Doc. 39-14, pp. 23-24, 31-32).   The arrival and departure scans on the archived timesheets should be accurate if they showed her hand scans and if they were not transferred or edited. However, Ms. Smith explained that if the archived timesheets showed overtime, the secretary would regularly require Ms. Smith to sign an override sheet.  Then, the secretary would adjust the timesheets to subtract the overtime, because the principal said the Board would not pay overtime. (*Id.* pp. 37-40).

*6-hour Work Days*

Ms. Smith testified in her deposition that when she was a 6-hour employee in May, August and September of 2010, she arrived about 7:15-20AM[21] and clocked in when she arrived and clocked out when she stopped working at 2:00PM or afterwards. Although she clocked out

---

[21] The court notes that Ms. Smith's June and July 2010 archived time sheets showed a 7:30AM-2:00PM scheduled work day but her scans showed that she arrived around 5:00AM and generally left work between 11:30 and 12:30PM with few supervisor edits.  She stayed later some days, but the scans did not reflect that she worked over 40 hours per week, given her testimony that she did not work off-the-clock at the beginning or end of her work days and accepting her testimony that she often worked her entire lunch break.  Ms. Smith's deposition testimony does not specifically address the summer work. (Doc. 136-8, at 7-8).

and in as if she were taking 30-minute breaks, she actually stopped working for about 5-10 minutes of the 30-minute break some days and she worked straight through her break on the majority of the days.  (Doc. 39-14, pp.18- 26, 29, 32, 33).  The archived unsigned timesheets contain extensive supervisor edits and generally confirmed Ms. Smith's testimony that when she was a 6-hour employee scheduled to start at 7:30AM, she regularly scanned in early (regularly 30 minutes before her scheduled arrival time in August of 2010 and regularly 45 minutes to an hour before her scheduled arrival time in September of 2010) and regularly scanned out late (ranging from 10-24 minutes in May of 2010; from 8-61 minutes in August of 2010;  from 8-31 minutes in September of 2010).  However, supervisor "transfer" edits subtracted the time scanned before and after the scheduled times.  The May and August 2010 archived timesheets also contained numerous supervisor edits to add punches in and out for lunch breaks and to reflect that Ms. Smith worked 6 round hours. Yet, even assuming that Ms. Smith worked the entire 30 minutes of her breaks and adding back the time subtracted through the transfer edits, the archived time sheets of May, August and September of 2010 did not reflect that Ms. Smith worked more than 40 hours per week[22] when she was scheduled to be a 6-hour employee. Because this period occurred before her promotion, Ms. Smith would not have performed additional duties such as production paperwork and bank deposits after scanning out for the work day.

Therefore, the court FINDS that Ms. Smith did not raise a genuine issue of material fact that she worked over 40 hours per week in May through September of 2010.

---

[22] The court notes, however, that, if one assumes that Ms. Smith worked through her entire 30 minute break,  Ms. Smith came very close to but did not exceed 40 hours per week in September of 2010, when she scanned in many days approximately an hour before her scheduled arrival time and usually worked approximately 30 minutes past her scheduled departure time. (Doc. 1336-8, at 11-12).

*7 ½ Hour Employee*

When she was a 7 ½-hour employee in October of 2010, the archived time sheets reflected that she generally clocked in within a few minutes of her scheduled arrival time of 6:30AM and generally clocked out within a minute or two of her scheduled departure time of 2:30PM.  Most of the supervisor edits were adding punches where none existed or transferring time to ensure that the break reflected a full 30-minutes.  In 5 instances during that month, the transferred time was for early scanning-in that ranged from 8-11 minutes.  However, one of the weeks that time was transferred because she scanned in early three mornings (subtracting 8, 9 and 11 minutes) included a holiday, which meant that the totals for the entire week would be less than 40 hours.  The week beginning Monday October 25, 2010 included two transfers for early arrival, one for 8 and one for 9 minutes during the week; this week Ms. Smith may have worked overtime only if  Ms. Smith worked the entire 30 minutes during her lunch breaks that week and did not receive the 5-10 minute break that she acknowledged she took some days. (Doc. 136-8, at 13-14).

Therefore, the court FINDS that Ms. Smith has raised a genuine issue of material fact that, in October of 2010, she worked more than 40 hours per work week and did not receive overtime pay.

*7-Hour Employee*

When she was promoted to a 7-hour employee during the Fall of 2010, Ms. Smith testified that she scanned in when she arrived at 6:15AM or 6:20AM and began working.  (Doc. 39-14, pp.13 & 25, 32, 33). Although she clocked out and in as if she were taking 30-minute breaks, she actually stopped working for about 5-10 minutes some days and she worked straight

through her break on the majority of the days.  (*Id.* pp. 18-25).    She did not clock out and work off-the-clock in the afternoons but would finish her job and clock out when she actually left for the day, which was later than her 2:00PM scheduled departure time.  (*Id.* p. 32, 33, 37).

In addition to the work she performed at the school, Ms. Smith testified that, as an Assistant Manager, she took paperwork home approximately two times per week and took daily trips to the bank after she scanned out for the day (Doc. 39-14, at 47-48).  In her answers to interrogatories, Ms. Smith stated that the paperwork took one hour twice a week and the bank trip took approximately 35 minutes each day.   (Doc. 81-7, at 2 interrog 5).  Adding this off-the-clock time would mean that Ms. Smith regularly worked more than 40 hours per week in her 7-hour position, and she estimated in her interrogatory answers that she worked approximately 44 hours of overtime per month for which she has not been compensated. ( *Id.*).

When she was a 7-hour employee beginning in November of 2010, the archived timesheets reflect that she regularly scanned in 5-15 minutes (and occasionally more) prior to her scheduled shift and regularly scanned out after her scheduled departure time, sometimes less than 10 minutes and sometimes as much as 30 minutes or more.  However, supervisor edits regularly transferred time in the mornings and evenings to the scheduled scan times without reflecting the [0] sign that the scan had been edited.  Those changes meant that, accepting Ms. Smith's testimony that the majority of the time she worked through her entire lunch break and that she went to the bank after hours off-the-clock, she occasionally worked more than 40 hours in a given week and earned overtime but did not receive overtime pay.

For example, during the week of November 1-5, 2010, the archived timesheet shows that Ms. Smith worked 6:22AM-2:30PM on Monday (8 hours 8 minutes if she worked through her

break, but 38 minutes were subtracted from arrival/departure scans); 6:23AM-2:32PM on

Tuesday (8 hours and 9 minutes if she worked through her break, but 32 minutes were subtracted

from departure scan); 6:24AM-2:37PM on Wednesday (8 hours and 7 minutes if she worked

through her break, but 37 minutes were subtracted from departure scan); 6:27AM-2:34PM on

Thursday (8 hours and 7 minutes if she worked through her break, but 34 minutes were

subtracted from her departure scan); and 6:23AM-2:30PM on Friday (8 hours and 7 minutes if

she worked through her break, but 30 minutes were subtracted from the departure scan). The

total overtime for the week would be 38 minutes or less—recognizing that Ms. Smith said that

she worked the entire 30 minute break the majority of the time but on some days received a 5-10

break—plus the time she spent off-the-clock to complete paperwork and to make her daily trip to

the bank after scanning out for the day. (Doc. 136-8, at 15-82 & 81-7, at 2). Ms. Smith testified

that she received mileage compensation of $80 per month for the daily trip to the bank. (Doc. 39-

14, pp. 53-54).

   The court FINDS that Ms. Smith has raised a genuine issue of material fact that, during

the period beginning in November 2010 when she was a 7-hour per day employee, she worked

over 40 hours per work week and did not receive overtime pay.

   14. **Andrea Stallings:** Ms. Stallings was a CNP Manager at Hill and Tuggle Elementary

Schools, which merged. She was scheduled to work 8 hours per day (6:30AM-3PM, including a

30-minute break). Ms. Stallings testified that she generally scanned in at about 6:30AM[23] and

began working, scanned out and in for break but actually took no break, and then scanned out

_____

   [23] Ms. Stallings's declaration from the *Banks* case reflected that she began her duties at
6AM and clocked in at 6:30AM. Regardless of whether she began work at 6AM or 6:30AM, her
testimony is that she worked more than 40 hours per workweek.

everyday at 3:00 PM but actually left around 3:30PM, resulting in an actual work schedule of approximately 9 hours per day and 45 hours per week.  (Doc. 39-15 p. 16, 18, 24, 28, 49).  Occasionally, she would stay later if the grocery delivery were delayed or if some other delay occurred.  (*Id.* p. 29).   After scanning out for the day, she took the deposit to the bank daily, a process that took about 40 extra minutes every day.  (*Id.* p. 26).  Before the 2013-14 school year, she also took production records home to complete paperwork two or three times per week, and that process took 30-45 minutes each time.[24]  (Doc. 39-15, pp. 46-48).  Ms. Stallings's interrogatory answers are generally consistent[25] with her deposition testimony.  She estimated that she worked approximately 38 hours a month[26] of overtime for which she has not been compensated.  (Doc. 81-13, at 2 interrog. 5).

Ms. Stallings's signed time sheets cover August 2012 through February 2014 and reflected scant overtime before the 2013-14 school year:  1.5 hours of overtime in February of

---

[24] In her declaration prepared for the *Banks* case, she stated: "On a daily basis I prepare production reports at home for 3 to 4 hours in addition to the hours I spend as Manager at Hill Elementary School." (Doc. 81-11, at 3).  However, during the period relevant to the instant case, Ms. Stallings worked at Tuggle Elementary School.  At some point Tuggle and Hill merged, so from Ms. Stallings's testimony, the court cannot determine if this statement regarding daily production report work is relevant to the time period of this case.

[25] Ms. Stallings's interrogatory answer number 5 stated that going to the bank took an additional 25 minutes after she clocked out.  (Doc. 81-13, at 2).   That answer could be consistent if the trip to the bank took 25 minutes but that the entire banking process totaled 40 minutes. The other information is consistent with her deposition testimony.

[26] In her declaration prepared for the *Banks* case, Ms. Stallings stated that her normal work week was between 60 and 65 hours per week, which was significantly more overtime than the amount listed in her deposition and interrogatories in the instant case.  The *Banks* case was filed just over a year before the instant case, so the relevant time periods in the cases are not completely consistent; however, a considerable time overlap exists between the two cases.  (Doc. 81-11, at 3).

2013, half-an-hour overtime in April of 2013, quarter hour of overtime in May of 2013. (Doc. 50-41, at 1-5 & 13-17). During the 2013-14 school year, after the filing of this lawsuit, she received overtime many months: 11.25 hours of overtime in August of 2013; 5 hours of overtime in September of 2013; 1.5 hours of overtime in October, when she received a week of sick and personal days; 1.5 hours of overtime in November; 5 hours of overtime in December; and 1.25 hours in February 2014. (*Id.* at 6-11). Her archived unsigned timesheets in the record cover only two relevant months: January 2011 and August 2011. They reflected only added punches where none existed before, generally adding break times and departure scans. (Doc. 31-12, at 3-6; 81-12, at 3-6). The signed timesheet for February 2014 also includes supervisor edits, which reflected only added random punches where none existed before. (Doc. 50-41, at 12). Given Ms. Stallings's testimony regarding working off-the-clock, these timesheets do not contradict that testimony.

The court FINDS that Ms. Stallings has raised a genuine issue of material fact that she worked over 40 hours a work week without overtime compensation.

15. **Valerie Thomas:** Ms. Thomas was a CNP worker at Woodlawn Hight School who was scheduled to work 6 hours per day (8:30AM-3:00PM, including a 30-minute break) and 30 hours per week. Her signed timesheets during the relevant period reflected that she generally worked exactly 6 round hours per day. (Doc. 50-48). However, beginning in January of 2012, the timesheets reflected some occasional straight time in addition to the regularly scheduled hours, but no overtime except during one month, August of 2013, when her timesheet reflected overtime in three separate weeks. (*Id.* pp. 27-48). Her unsigned archived timesheets covered two relevant months and reflected supervisor edits: adding numerous break punches; and

transferring scan times that subtracted time from Thomas's scans ranging from 4 to 28 minutes, but with the majority subtracting less than 15 minutes.  (Doc. 81-24 pp. 2-3).

In her deposition testimony, Ms. Thomas testified that she worked the following hours off the clock at the direction of her manager: each day, she began working 30 minutes early before scanning in, generally worked through her entire 30-minute lunch break but occasionally used a portion of her break, and worked 15-30 minutes after scanning out.  (Doc. 39-16, pp 9-14, 17-19, 30-31).  This testimony is consistent with her interrogatory answers.  (Doc. 81-25, at 2, interrog. 5).

If the grocery truck was late, she would work as much as an hour after scanning out. (Doc. 38-16. p. 13). On one occasion she worked until 4:15PM, but that was an unusual situation when the school was on lockdown because of a report of a person on the premises with a gun. (*Id.* p. 14).  However, she did not establish that an occasional late truck or the lockdown situation caused her to work over 40 hours during any work week. Ms. Thomas estimated that she usually worked an extra hour and 15-30 minutes each day off-the-clock, which would total 36 hours and 50 minutes to 37 hours and 30 minutes per workweek; by her testimony, those totals would not entitle her to overtime under the FLSA.  (*Id.* at 20, 30-31).

Therefore, the court FINDS that Ms. Thomas has failed to raise a genuine issue of material fact that she worked over 40 hours per work week without overtime pay.

16. **Julia Williams:** Ms. Williams held the position of CNP Manager at Central Park Elementary where she was scheduled to work 8 hours per day (6:00AM-2:30PM, including a 30-minute break).  In her deposition testimony, Ms. Williams stated that she arrived at school at approximately 5:45AM and started working but scanned in at 6:00AM.  (Doc. 39-17, p. 12).  She

would scan in and out for break, but she sometimes got part of a break and sometimes she was able to take her full 30 minutes. (*Id.* p. 14-15).  In the afternoon, she would scan out at 2:30PM, but she would usually leave at 3:00PM.  (*Id.* p. 16).  Occasionally, she would stay even later if the grocery delivery truck was late arriving at the school.  (*Id.* p. 22). Once or twice a week, she took production paperwork home and worked off-the-clock for approximately 45 minutes; she was not clear whether she worked 45 minutes each day she prepared the paperwork or 45 minutes each week.  (*Id.* p. 21).  She did not take the deposit to the bank; her assistant did that for her. (*Id.* p. 33).

The signed timesheets for Ms. Williams reflected no overtime.  (Doc. 50-36, at 1-37). The archived unsigned timesheets covered only 3 relevant months: August of 2010, August of 2011, and January 2012.  The supervisory edits for August 2010 and 2011 involved mostly punch additions when no other scans existed.   However, occasionally the edits "transferred" time that would not show up as an edit on Ms. Williams's signed timesheets, and the edits for January of 2012 transferred 30 minutes from Ms. Williams's time almost every day.

For example, the following "transfers" took significant time away from Ms. Williams's scanned time on her timesheets but did not show up as edits with a [0] on the signed timesheets:

- on August 4, 2010–the editor transferred the scan at 2:58PM to 2:30PM (doc. 81-4, at 3);
-  on August 9, 2011–the editor transferred the scan at 2:49PM, changing it to 2:00PM, which showed on the signed timesheet for that date that Ms. Walker worked 6 hours instead of 7 hours (doc. 81-4, at 5; doc. 50-36, at 11);
-  on January 4-6, 9-13, 17-20, 23-27 & 31, 2012–the editor transferred arrival scans at 5:30AM, changing them to 6:00AM, which meant that, even by the archived timesheet alone Ms. Walker was working 8 ½ hours on those days and more than 40 hours each week during that month, but the signed timecard for January 2012 reflected no overtime at all (doc. 81-4, at 6; doc. 50-36, at 16).

The August 2010 and August 2011 transfers would have affected pay but not overtime; however, the January 2012 transfers resulted in Ms. Williams receiving no overtime pay when the archived timesheets indicated that she had earned over 9 hours of overtime. (*Id.*).

These three archived timesheets provided little of the complete picture because they covered only three months.  They do support Ms. Williams's testimony to the extent that she claimed to work at school before and after her scheduled arrival and departure times; however, because she claimed to have worked off-the-clock, the timesheets cannot fully support or fully contradict her testimony.  They do confirm that she did work more than 40 hours on some weeks for which she did not receive overtime pay.  Thus, the court FINDS that Ms. Williams has created a genuine issue of material fact that she worked more than 40 hours per work week for which she did not receive overtime pay.

17.  **Rhonda Yancey:** Ms. Yancey held the position of CNP Manager/Supervisor at Hudson Middle School and was scheduled to work 8 hours per week (6:00AM-2:30PM, including a 30-minute break, from August 2010 through November 2013; 6:30AM-3:00PM, including a 30-minute break, from December 2013 through February 2014).  (Doc. 38-43, 10-17; Doc. 50-45, at 1-12).

Ms. Yancey testified that when she was scheduled to begin work at 6:30AM, she actually began working off-the-clock around 6:00-6:10AM, which was necessary to have breakfast ready on time, and then she would wait to scan in closer to 6:30AM.  (Doc. 39-18 pp. 9-11).  She and her workers would scan out and in for lunch break at the scheduled time from 9:30-10AM, but that time was so busy with lunch preparation that they always worked through it.   When Mr. Daniels was the principal, he insisted that they sit down for a break whenever they could take it,

so they took a late break around noon of about 15 minutes, very seldom the full 30 minutes; and they would not clock out for that late break since they had already done so at 9:30AM.  Under the new principal, Mr. Stewart, who took that position for the 2013-14 school year, she and her workers were on the same schedule, but they got fewer lunch breaks than under Mr. Daniels.  (Doc. 39-18, pp. 13-22, 25).

Ms. Yancey was scheduled to leave at 2:30PM but actually left and scanned out at 3:30PM[27].  (*Id.* pp. 22, 26-30).  When Mr. Daniels was her principal, she and her workers would clock out at the scheduled time and continue to work off-the-clock because he directed them to clock out  to avoid overtime.  When Ms. Yancey told Mr. Daniels that her workers were "not through," he responded: "Well, Rhonda, you have got to do something."  He told her to get her workers to clock out at the scheduled time even though they were not through; Ms. Sales, Director of the CNP, told her that her workers could not work off the clock, but she could not figure out a way to reconcile the two directives given the work load.  (*Id.* p. 33). Under Principal Stewart during the 2013-14 school year, she and her workers continue to work off-the-clock some afternoons.  On some days, her administration told her to get off the clock, so she and her workers would scan out and continue to work off-the-clock to prevent getting in trouble "or being wrote up for not following orders."  Ms. Yancey had explained to Mr. Stewart that she and her workers did not have a choice but to work overtime to complete their tasks, and she testified at her deposition in March of 2014 that recently the administration had not "been getting on us" about the overtime.  (*Id.* p. 31).

---

[27] At one point, Ms. Yancey stated that she actually left at 3:00PM and other places she stated that she left at 3:30PM.

Ms. Yancey also stated that she did not receive pay for the time that she worked on production records at home and the times she stayed late for late delivery trucks. (Doc. 39-18, p. 44).  She also did not receive pay for the time she spent off-the-clock to take deposits to the bank after work; the trip to the bank took about 15-20 minutes and the trip from the bank to her home took about the same amount of time. (*Id.* pp. 49-50).  Ms. Yancey's sworn responses to interrogatories were largely consistent with her deposition testimony of working 6AM-3:30PM plus the bank deposits and paperwork, except that she indicated in her interrogatory answers that she always worked through her lunch break.  She also specified that she took paperwork home three nights per week, working approximately 45 minutes each of those nights, and she estimated the hours worked per month without pay to be 49.  (Doc. 81-21, at 2 interrog 5).

Ms. Yancey's signed timesheets reflected that she worked (and thus, may have been paid) overtime many months, although the amount varied from 1.75 to 9 hours, and never approached the hours she claims to have regularly worked.  The timesheets' scan-in times partially corroborate Ms. Yancey's testimony to the extent that she claimed to arrive regularly at 6:00 even after her scheduled arrival time was changed to 6:30PM; her December 2013 scan time continued to remain near 6:00AM despite the schedule change, and the later scan times were consistent with her claim that she would continue to arrive as usual but scanned in closer to 6:30AM.  Her scan out times partially corroborated her claim that she tried to remember to scan out at the scheduled time of 2:30PM but actually worked much later: the timesheets showed that, although she often did scan out at 2:30PM, she also often scanned out after 3:00 and even after 3:30PM. (Docs. 38-43 &50-45).

66

The archived unsigned time sheets only contain one relevant month: October of 2013, which shows 4.5 hours of overtime worked.   The supervisor edits are mostly added punches where none existed, and the three supervisor edits transferred time that was in Ms. Yancey's favor.  (Doc. 81-20, at 5-6).  Because of Ms. Yancey's testimony that she worked off-the-clock, the archived time sheets neither fully corroborate nor contradict her testimony.

The court FINDS that Ms. Yancey's testimony raises a genuine issue of material fact that she worked over 40 hours per work week but did not receive overtime compensation.

In sum, the following Plaintiffs failed to raise a genuine issue of material fact that they worked more than 40 hours in any work week during the relevant period: Clarence Batain, Tammra Harris, Andraina Henry, and Valerie Thomas; the court WILL GRANT the motion for summary judgment as to their claims.

The following Plaintiffs raised a genuine issue of material fact that they worked more than 40 hours at some point during the relevant period, but failed to raise a genuine issue of material fact as to other parts of that relevant period: Michelle Dunner, Juanita Freeman, and Rhonda Smith.  Accordingly, the court WILL GRANT IN PART their claims.  Specifically,

- As to the claims of Michelle Dunner, the court WILL GRANT the motion as to the relevant period *except* for the period when she was allegedly acting CNP manager in Ms. Cochran's absence.
- As to the claims of Juanita Freeman, the court WILL GRANT the motion as to the relevant period after Ms. Humphrey left Woodlawn High School and Ms. Freeman worked under other supervisors.
- As to the claims of Rhonda Smith, the court WILL GRANT the motion from May 2010 through September 2010.

With those specific exceptions, Plaintiffs Dunner, Freeman, and Smith join the remaining

Plaintiffs —Daryl Carr, Anita Clark, Wanda Holt, Tommy Murray, Geraldine Parker, Teresa Phillips, Andrea Scott, Andrea Stallings, Julia Williams, and Rhonda Yancey—all of whom have raised a genuine issue of material fact that they worked over 40 hours per work week during the relevant period without overtime compensation.  For summary judgment purpose, they have established the *first* element of their FLSA claim.

### 3.  Notice

As previously discussed, Plaintiffs who have demonstrated that they worked overtime without compensation have only established the first element of an FLSA overtime violation. They must also demonstrate "that the Board knew or should have known of the overtime work." *Allen,* 495 F.3d at 1314-15.

The Board disputes that the Plaintiffs have demonstrated the element of notice, arguing that "[t]he undisputed evidence shows that plaintiffs' supervisors had no knowledge of overtime worked" and that "the record is devoid of evidence that the Board had any knowledge of unreported overtime."  (Board's Br. Doc. 71, at 25).  The court disagrees with the Board's assertion.

### a.  Actual Notice

As set out in the previous section of this Memorandum Opinion, entitled "FLSA Law," the Eleventh Circuit has held that knowledge of overtime hours worked "may be imputed to the employer when its supervisors or management 'encourage[ ] artificially low reporting.'" *Bailey*, 776 F.3d at 801 (citing *Allen*, 495 F.3d at 1318-19).  Specifically, when employees testified that supervisors instructed employees to underreport work hours by working off-the-clock and/or "squelched truthful timekeeping by changing [ ] time records to show fewer hours worked," the

68

Court of Appeals found that this evidence raised a genuine issue of material fact as to the employer's actual notice of the FLSA overtime violations. *Id.* Controlling case law instructs that when immediate supervisors instruct their employees to underreport hours, the employer cannot disclaim knowledge of FLSA violations even though upper management encourages proper reporting of all overtime. *Brennan*, 482 F.2d at 828. Thus, the Eleventh Circuit has found that when evidence existed from which a jury could conclude that supervisors of school board employees were aware that those employees were working overtime hours without overtime compensation, "actual knowledge can be presumed and summary judgment was not appropriate." *Allen,* 495 F.3d at 1318-19.

Applying that law to the instant case, the court looks to the evidence about the awareness of the Plaintiffs' supervisors that the Plaintiffs were working uncompensated overtime and whether those supervisors encouraged artificially low reporting of work hours. The evidence presented by all remaining Plaintiffs who met the first element of the FLSA case—Daryl Carr, Anita Clark, Michelle Dunner, Juanita Freeman, Wanda Holt, Tommy Murray, Geraldine Parker, Teresa Phillips, Andrea Scott, Rhonda Smith, Anita Stallings, Julia Williams, and Rhonda Yancey—raises genuine issues of material fact that their supervisors had actual knowledge of their working overtime hours without overtime pay.

*(1) CNP Workers and Assistant Managers*

The CNP workers/assistant managers all testified that their immediate supervisors were aware that they worked beyond their scheduled hours without pay. (Carr Dep. Doc. 39-2, at 26-27, 45, 48; Dunner Dep. Doc. 39-5, at 24, 27; Freeman Dep. Doc. 39-6 pp. 58-59, 63, 66, 71, 83; Holt Dep. Doc. 39-9, pp. 30, 47-48, 66; and Smith Dep. Doc. 39-14, pp. 47-48, 61, 66). Because

CNP staff worked in their supervisors' presence, those supervisors would know the extent of their work, and would know that they were working more than 40 hours per week, if their testimony is true.  Half of those CNP Managers who are Plaintiffs acknowledged their awareness that the workers they supervised regularly worked off-the-clock to complete their tasks.  (Parker Dep. Doc. 39-11 pp. 47-48, 52; Stallings Dep. Doc. 39-15, pp. 16, 37-38; Yancey Dep. Doc. 39-18 pp. 13, 17-20, 31). Further, Mr. Carr, Ms. Dunner, Ms. Freeman, and Ms. Holt all testified that they worked the extra hours off-the-clock *at their supervisor's direction*.  (Carr. Dep. Doc. 39-2, at 26-27; Freeman Dep. Doc. 39-6, pp. 58-59, 63, 66, 71; Holt Dep. Doc. 39-9, pp. 30, 47-48, 66).

The immediate supervisors of the CNP workers were not the only management personnel aware of their overtime.  When taken in the light most favorable to the Plaintiffs, the evidence also reflected that all *principals* of those CNP workers were aware of the underreporting of hours actually worked.  (Dunner Dep. Doc. 39-5, pp. 12-17, 57-59, 75-59; Thomas Dep. Doc. 39-16, pp. 23, 41- testifying about the awareness of the principal at Woodlawn High School where Ms. Freeman and Ms. Holt worked; Smith Dep. Doc. 19-14, pp. 61 & 66; Yancey Dep. Doc.  39-18, pp. 33-35-testifying about the awareness of the principal at Hudson Middle School, where Mr. Carr worked).  Because principals signed the timesheets underreporting the overtime, a jury could find that they participated in the artificially low reporting of the work hours.

Further, when taken in the light most favorable to the Plaintiffs, evidence reflected that CNP Director Michelle Sales was aware that CNP workers and supervisors had worked time for which they received no pay; Ms. Smith and Ms. Yancey said that they had specifically advised Ms. Sales that they and co-workers had worked time for which they received no pay, but the

overtime work was not submitted in the signed timesheets.  (Smith depo. Doc. 39-14, at 17 pp.

66-67; Yancey depo.doc. 39-18 p. 14).  Claudia Cochran, who is not a plaintiff in this action,

similarly testified to having advised Ms. Sales that the CNP workers under her supervision,

including Plaintiff Michelle Dunner, were working off-the-clock over Ms. Cochran's objection.

(Doc. 39-4, at 13, p. 48). However, Ms. Cochran's supervisors never disciplined Ms. Dunner for

working off-the-clock.  (Doc. 39-4 p. 48). Although Ms. Sales denies receiving that information,

the court must accept at this summary judgment stage the testimony of Ms. Smith, Ms. Yancey,

and Ms. Cochran that they advised Ms. Sales that CNP employees were working off-the-clock.[28]

Therefore, the court FINDS that CNP workers Daryl Carr, Michelle Dunner, Juanita

Freeman and Wanda Holt as well as assistant manager Rhonda Smith have raised a genuine issue

of material fact that their supervisors had actual notice that they were working over 40 hours per

work week without overtime compensation; and further, that their supervisors encouraged

artificially low reporting of their work hours.

---

[28] In her affidavit, Michelle Sales stated that, since 2012, she has been a Director of the Child Nutrition Program—the program that oversees the cafeterias in the Birmingham school system—either as an interim or the permanent holder of that position.  She confirms that the principal at each school is the site supervisor of the manager of the Child Nutrition Program for that school.  Ms. Sales stated that neither she nor her staff told any CNP managers to allow employees to work off the clock, work longer than the scheduled hours, or work through the lunch break; and that CNP managers were advised that they should not take work home, because they could complete all paperwork during scheduled work hours.  She stated that she was "not aware of any Child Nutrition Program manager, worker or assistant manager who is a plaintiff in this case submitting hours for which they have not been paid."  (Doc. 50-2, at 3, ¶ 9).  That categorical denial of awareness conflicts with the testimony of Plaintiffs Rhonda Smith and Rhonda Yancey, unless the emphasis of the sentence is upon awareness of hours *submitted* in the signed timesheets instead of awareness of overtime hours actually *worked.*

*(2). CNP Managers*

The Plaintiffs who are/were CNP Managers acknowledged that they themselves worked more than their scheduled hours without pay because working extra hours was the only way to complete their tasks.  The CNP Managers further acknowledged that their own supervisors, their principals, were aware that the Managers were working overtime without overtime pay, and some of the CNP Managers also talked to the CNP Director and/or the area supervisor about the overtime work without pay. (Clark Dep. Doc.  39-3 pp. 18-21, 23-24, 41-42 [advised Principal Watts]; Parker Dep. Doc. 39-11 pp. 29-30 [advised Ms. Jackson, area supervisor, who also witnessed Parker's working overtime], 44-45 & 53 [Ms. Sullivan, the principal, told her to work off-the-clock]; Phillips Dep. Doc. 39-12, pp. 30-32 [advised supervisor Spencer Taylor, CNP Director at the time & also talked to the principal at Lewis, Dr. Irene Hunter]; Stallings Dep. Doc. 39-15, pp. 16, 29, 30-31, 33-34, 44-45, 50-51, 59-61, 69 [advised her principal at Tuggle; Ms. Sales directed Stallings to wait on late truck[29]; Mr. Banks required her to go the bank every day after work]; Williams Dep. Doc. 39-17, pp. 24-28 [advised supervisor Spencer Taylor, CNP

---

[29] Ms. Sales stated in her affidavit that when an emergency arose, such as a late truck arrival, CNP managers would contact her office and advise office staff of the situation.  She did not explain, however, whether such notice of emergencies resulted in properly paying employees for the overtime that ensued; nor did she specifically state that when such emergencies arose, she ensured that the employees involved receive overtime pay.  In the next sentence of her affidavit, "CNP managers have been advised that all overtime must be approved in writing by the Superintendent in advance," Ms. Sales made no exception for emergencies and did not explain why this directive conflicts with the 2012 policy allowing supervisors other than the Superintendent to approve overtime.  (Doc. 50-2, at 3 ¶ ¶  8-9).

  Indeed, Plaintiff Andrea Stallings, who was scheduled to work 40 hours per week, testified at her deposition that Michelle Sales would direct her to stay late to wait on the grocery truck or on the plumber to fix sewage leaks after scheduled work hours.  Therefore, Ms. Sales would have been aware that Ms. Stallings was working overtime at times and directed her to do so.  (Doc. 39-15, pp. 32-34).  The court must accept the testimony of Plaintiff Stallings at this summary judgment stage.

Director at the time; and principal Dr. Nicole Davis Williams changed Ms. Williams's time to take off overtime worked, because she said the Board did not pay it]; Yancey Dep. Doc. 39-18, pp. 9-10, 13-14, 17, 20, 22, 31, 33-35 [advised her principal]).  As noted before, because principals signed the timesheets underreporting the overtime, a jury could find that they participated in the artificially low reporting of the work hours.

Therefore, the court FINDS that CNP Managers Anita Clark, Geraldine Parker, Teresa Phillips, Anita Stallings, Julia Williams and Rhonda Yancey have raised a genuine issue of material fact that their supervisors had actual notice that they were working over 40 hours per work week without overtime compensation; and further, that their supervisors encouraged artificially low reporting of their work hours.

### (3). Custodian and Bookkeeper

Head Custodian Tommy Murray and Bookkeeper Andrea Mixon Scott testified that their supervisors, the school principals, knew that the overtime problems existed beyond the lunchroom. Mr. Murray's testimony was that his principals knew he was working regularly outside of his scheduled hours and off the clock, and would often direct him to come on weekends to handle maintenance issues or open the building for outside groups. (Doc. 39-10, at 45-47, 66).   Further, his principals expected him to answer janitorial calls regardless of whether he was on lunch break.  (*Id.* p. 52-54).  Mr. Murray had complained to his principals specifically about working overtime without pay, but the principals did not provide a solution and continued to question the extra hours on his timesheets when overtime appeared.  *Id.* pp. 67-68 & 81.

According to Mr. Murray, the administration often simply refused to pay him more than his regular salary even when his timesheets showed that he had earned overtime.  (Doc. 39-10,

pp. 61-63,. 65-69, 81-82).  Mr. Murray explained that he has existed in a catch-22 situation ever since the Board established the policy of not paying overtime because his principals continued to direct him to do work after the scheduled hours and off-the-clock, directives that he could not refuse without being accused of being subordinate.  Because the Board will not pay overtime, he was forced to perform the directed work without pay.  (*Id.* pp. 53, 63-64).  The verification on each of Mr. Murray's official timesheets included not only his signature but also that of his supervisor.  Doc. 50-34.

Andrea Mixon Scott, a bookkeeper, testified that the principal, Dr. Sherena Carpenter, was her direct supervisor and signed her timesheets (stating that they were accurate) until she left in 2013.  Ms. Scott stated that, as her supervisor, the principal was fully aware about the time Ms. Scott actually worked that was edited to decrease overtime and was also aware that Ms. Scott worked through lunch breaks.  Further, her principal was the one sending her on errands, such as the bank deposits after hours. (Scott Dep. Doc. 39-13, pp. 22-26; timesheets: Docs. 50-39; 38-39; 38-40).

The court FINDS that Mr. Murray and Ms. Scott have raised a genuine issue of material fact that their supervisors had actual notice that they were working over 40 hours per work week without overtime compensation; and further, that their supervisors encouraged artificially low reporting of their work hours.

In sum, the Plaintiffs have presented testimony that their supervisors knew about and encouraged artificially low reporting, and thus, have raised a genuine issue of material fact as to those facts.  Under those circumstances, the Eleventh Circuit instructs that the supervisors' *actual* knowledge may be imputed to the Board for the purposes of summary judgment.

74

Accordingly, the court FINDS that all remaining Plaintiffs have met their burden as to the second element of notice, creating a genuine issue of material fact as to actual notice.

### b. Constructive Notice

Having found a genuine issue of material fact as to *actual* notice, the court could stop at this point. However, the court recognizes that addressing *constructive notice* as an alternative ruling may be helpful to these parties. The parties have presented the following facts to the court that are relevant to the issue of constructive notice.

Superintendent Craig Witherspoon, and Chief Financial Officer Arthur Watts, Jr., both deny awareness that any FLSA violations occurred involving the Plaintiffs. Superintendent Witherspoon stated in his affidavit that "[p]rior to the filing of the present suit, I was not made aware of any instances by any plaintiff of alleged overtime worked but not paid for, and I know of no such instances of such overtime occurring." (Doc. 50-1, at 5 ¶ 10).

Chief Financial Officer for the Birmingham City Schools, Arthur Watts, Jr., stated in his affidavit that "[p]rior to the filing of this suit, I was not made aware of any instances by any plaintiff of alleged overtime worked but not paid for, and I know of no such instances of such overtime occurring." (Doc. 50-3, at 1 ¶ 2). To the extent that this statement implied that Watts was not aware of any practice in the school system that involved school employees working overtime without pay (the affidavit specifically limits awareness to overtime worked by Plaintiffs) and that existed prior to the filing of this suit in May of 2013, Attachment 1 to his affidavit contradicts that implication.

Attachment 1is a Memorandum dated January 16, 2008 from Watts to Principals, Coordinators, Directors, and Supervisors stating in pertinent part as follows:

Re:      Changing Time

We are noticing that some Principals/Supervisors may be adjusting employees' time in the EAMS (time management system) after they have worked beyond their scheduled work hours.  **This practice is to cease immediately**.  If a non-exempt employee actually works a specific number of hours, we are obligated to pay him/her for the time he/she provided the service.  ***This holds true whether overtime has been approved or not.***  Again, ***under no circumstance*** should a Principal/Supervisor adjust the time an employee ***has already*** worked in the EAMS (time management system).  You may make minor adjustments to the employee's work schedule.

While we appreciate Principals and Supervisors monitoring the work schedules of non-exempt employees, the Fair Labor Standards Act requires that we pay an employee for actual time served.  I would strongly suggest that you monitor the electronic timesheets daily of all non-exempt employees to ensure that they do not work more than their scheduled hours during a workweek . . . .

(Doc. 50-3, at 6).  Although this memorandum is dated over two years *before* the relevant time frame for the instant case, it does reflect that the Board was on notice that some schools had previously had a practice of adjusting employees' timesheets to subtract time that they had actually worked.

The record reflected *no evidence*[30] that the Board followed up with the principals or supervisors to determine if the prohibited adjustments had continued; nor did it provide evidence that the Board checked the archived unsigned timesheets, which would show all edits to the actual scan times.  As discussed previously, the Plaintiffs testified that their principals and supervisors knew of the overtime worked without pay.  Further, principals signed the timesheets and knew or should have known of adjustments made to them by employees working under them.  The Board had instructed principals to monitor the timesheets for adjustments.  However,

---

[30] The record in this case is extensive.  The parties pointed this court to no such evidence, and the court's own review of the record revealed none.

the record of this case reflected that adjusting the Plaintiffs' scan times in EAMS continued

during the relevant time period for this lawsuit to subtract time worked beyond their scheduled

hours, whether the adjustments involved adding breaks that did not exist or adjusting the arrival

or departure times that were outside the regularly scheduled times.  *See* Carr Doc. 36-2; Clark

Doc. 81-16; Dunner Doc. 81-28; Freeman Doc. 136-4; Holt Doc. 136-7; Murray Doc. 81-1;

Parker Doc. 81-14; Phillips Doc. 81-22; Scott Docs. 38-39, 38-40, 50-39 & 81-34; Smith Doc.

136-8 at 5-79; Stallings Doc. 31-12, at 3-6; 81-12, at 3-6 & 50-41, at 12; Williams Doc. 81-4;

Yancey Doc. 81-20).

Therefore, as an *alternative* ruling, the court FINDS that the Plaintiffs have raised a

genuine issue of material fact that the Board had reason to believe that its employees, including

the Plaintiffs, performed overtime work without overtime pay and thus, had at least constructive

knowledge of such work.  In light of the past knowledge of inadequate recording of time and

knowledge of past adjustment of time scans, a jury could find that the Board had a duty to inquire

further to ensure that the schools were not continuing past violations.  Archived timesheets

would provide information that the prohibited practice of subtracting time actually worked

continued through the relevant time period, and those documents were readily available if the

Board had asked for them.  Further, in light of the evidence of alleged complaints regarding

widespread work performed off-the-clock and work performed on-the-clock but edited out of

official timesheets—complaints made to numerous principals and CNP Directors—a jury could

find that, if the Board did not actually know about overtime violations, it should have known.

Still further, a jury could find that the employer's own actions squelched truthful reports and

encouraged artificially low reporting. *See Allen,* 495 F.3d at 1319-20.  For all these reasons, the

77

court makes the *alternative* finding that the Plaintiffs have raised a genuine issue of material fact as to the Board's constructive knowledge of the alleged overtime violations.

Thus, the court FINDS that the remaining Plaintiffs have raised genuine issues of material fact regarding both elements of their FLSA case. The court would normally end its inquiry here; however, the Board has raised what is, in essence, an equitable argument that the remaining Plaintiffs are nevertheless precluded from proceeding with this case. Accordingly, the court will address that equitable argument.

### 4. Equitable Argument Based on Plaintiffs' Agreeing to Timesheets' Accuracy

Finally, the Board asserts that, regardless of whether the Plaintiffs have established FLSA overtime violations and the Board's knowledge of them, the Plaintiffs should be estopped from pursuing overtime claims because they falsely verified the lack of overtime on their timesheets by signing the timesheets under the statement "I agree this accurately reflects my time and I have not been requested to falsify this timesheet."

The Eleventh Circuit addressed a similar argument in the 2015 decision of *Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801-05 (11th Cir. 2015). In *Bailey*, the Defendant employer insisted that even though Mr. Bailey may have established the elements of his FLSA claim, the court should grant the employer's motion for summary judgment because of the equitable defenses of unclean hands and *in pari delicto*. Those equitable defenses were based upon Mr. Bailey's inaccurate reporting of hours because he worked off-the-clock at his supervisor's direction and because his supervisor repeatedly edited his time records to report fewer hours than he actually worked.

78

In *rejecting* the employer's equitable argument, the Eleventh Circuit relied on the *Allen*

decision's finding that the supervisors' knowledge was properly imputed to the employer.   It

then posed the following question: "is an employee deprived of his FLSA claim because he

underreported his time, even if knowledge of the underreporting is imputed to the employer?"

The Court of Appeals concluded that the correct answer is "no":

> Barring FLSA actions for wage and overtime violations where the employer is aware
> that an employee is underreporting hours would undermine the Acts deterrent
> purpose. Where, as here, an employer knew or had reason to know that its employee
> underreported his hours, it cannot invoke equitable defenses based on that
> underreporting to bar the employee's FLSA claim.

776 F.3d at 803-04.

Consistent with the *Bailey* decision, this court rejects the Board's argument in the instant

case that the Plaintiffs are precluded from asserting entitlement to overtime when they had

verified the inaccurate timesheets.   The Plaintiffs testified that they were told the Board would

not pay for overtime, that they understood paychecks would be forthcoming only if they signed

the timesheets and/or that they were concerned their jobs would be in jeopardy if they

complained about working overtime without pay.[31]   A jury could determine that signing the

---

[31] Some Plaintiffs testified that they did so because it was was common knowledge that if
employees did not sign the timesheet to verify the hours, they would not be paid.  (Scott dep. Doc.
39-13, pp. 61-62; Freeman dep. Doc.   P. 89).  Other Plaintiffs focused on the futility of
challenging hours that did not include overtime when they were repeatedly told that the Board
had a policy against paying overtime.  (Clark Dep. Doc. 39-3, pp. 23-24; Murray Dep. Doc. 39-
10, p. 62; Parker Dep. Doc. 39-11, pp. 34-36; Phillips Dep. Doc. 39-12, p. 24; Scott Dep. Doc.
39-13, pp. 61-62).  Several of the Plaintiffs testified that they did not dispute their time by not
signing the timesheets or complain about the inaccurate pay because they wanted to keep their
job and did not want to put the pay check and benefits in jeopardy, especially when their
supervisors were directing them to work off-the-clock.  (Holt Dep. Doc. 39-9, pp. 16-20;
Freeman dep. P. 66, 91-92; Murray Dep. Doc. 39-10, pp. 63-64; Thomas Dep. Doc. 39-16, pp
36-37 &41-42).   One Plaintiff said she never read the attestation over her signature, but simply
signed it as part of the payroll process.  (Scott Dep. Doc. 39-13, at 60).   Regardless of whether

timesheets was not an act reflecting dishonesty, but an act reflecting powerlessness; the verification of the timesheets was not dishonesty and gaming the system but rather, was a recognition that the system was gaming them but they had no power to change it.  The Supreme Court has explained that the FLSA'a "prime purpose" is "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 707 n. 18 (1945).

Under the alleged facts of this case, the school supervisors and other management directed the Plaintiffs to work off-the-clock and/or subtracted from their timesheets the extra hours actually worked, and those supervisors' knowledge is imputed to the Board.  Thus, precluding the remaining Plaintiffs from challenging the accuracy of timesheets would appear to fly in the face of the prime purpose of the FLSA and would ignore the Board's own alleged culpability.

The court rejects the equitable defense, and FINDS that the verification of the inaccurate timesheets does not bar the remaining Plaintiffs' claims in this suit.

---

the Plaintiffs specifically explained why they signed their timesheets, they repeatedly testified that they understood that the Board would not pay overtime, and that supervisors and administration had repeatedly discouraged them from reporting overtime, either through directing that they work off-the-clock, allowing them to do so, or changing their time to take off extra hours.  (Batain Dep. Doc. 39-1, pp. 53-54; Carr. Doc. 39-2, p. 41-42 & 81; Clark Dep. Doc. 39-3, pp. 22-24); Dunner Dep. Doc. 39-5, pp. 27-28 & 57, 83;Harris Dep. Doc. 39-7, p. 89; Murray Dep. Doc. 39-10, p. 49; Parker Dep. Doc. 35, 45; Phillips Dep. Doc. 39-12, pp. 18-24; Scott Dep. Doc. 39-13, pp. 61-62Thomas Dep. Doc. 39-16, pp. 35-37 & 41-42;Williams Dep. Doc. 39-17, pp 25-26 & 35; Yancey Dep. Doc. 39-18, p. 43)

5.  Willfulness

Because the court has found that some Plaintiffs have presented a genuine issue of material fact that would support a violation of the FLSA, the court then must determine whether the remaining Plaintiffs have raised a genuine issue of material fact as to willfulness of the alleged FLSA violation.  A cause of action arising out of a willful violation may be brought within three years after the action's accrual whereas the ordinary statute of limitations in cases brought under the FLSA is two years.  29 U.S.C.  § 255(a).

"To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  *Alvarez Perez,* 515 F.3d at 1162-63.  Showing reckless disregard is the "failure to make adequate inquiry into whether conduct is in compliance with the Act."  5 C.F.R. § 551.104.  A willful violation of the FLSA exists when the employer "'disregarded the very possibility that it was violating the statute.'"  *Allen, ,* 495 F.3d at 1323-24 (quoting *Alvarez v. IBP, Inc.,* 339 F.3d 894, 908-09 (9th Cir. 2003) (internal quotations omitted)).  "The determination of willfulness is 'a mixed question of law and fact.'"  *Id.* (quoting *Alvarez,* 339 F.3d at 908).

The Board insists that the Plaintiffs cannot show knowledge that the Board was violating the FLSA or reckless disregard of the possibility that it was violating the statute.  However, the court concludes that triable issues of fact remain as to this issue.  The Plaintiffs have testified that supervisory personnel repeatedly directed and/or encouraged and/or tolerated off-the-clock

81

working resulting in FLSA overtime violations, testimony that the Board disputes and that a jury could accept or reject.

Based on the evidence submitted at this stage, and depending on credibility choices, a jury could conclude that the Board put all the right official policies in place regarding "no overtime" and sent all the right memos with directives about complying with the FLSA to cover itself, but then, despite its knowledge of past practices of FLSA violations and its recognition that such practices might continue without follow-up and enforcement of the FLSA, the Board made no such enforcement attempt and recklessly disregarded the possibility of continued violations.  Based on the evidence submitted at this stage, a jury could also conclude that, although the Board officially allowed preapproval of overtime, the Board and supervisory personnel at the school made clear that the Plaintiffs should submit no overtime even if they worked overtime.

The court reserves the determination of which statute of limitations applies until the jury has settled this question of fact.

### 6.  Summary as to Rulings on Motion for Summary Judgment

In sum, for the reasons discussed above, the court will make the following rulings on the motion for summary judgment.

The court WILL GRANT the motion for summary judgment as to the claims of Clarence Batain, Tammra Harris, Andraina Henry, and Valerie Thomas.

The court WILL GRANT IN PART and DENY IN PART the motion as to the claims of Michelle Dunner, Juanita Freeman and Rhonda Smith.  Specifically:

- As to the claims of Michelle Dunner, the court WILL DENY the motion as to the period when she was allegedly acting as CNP Manager in Ms. Cochran's absence and took on managerial tasks that she performed after 2:00PM; however the court WILL GRANT the motion as to all other times during the relevant period.
- As to the claims of Juanita Freeman, the court WILL DENY the motion as to the relevant period when she worked under the supervision of Ms. Priscilla Humphrey but WILL GRANT the motion as to the relevant period after Ms. Humphrey left Woodlawn High School and Ms. Freeman worked under other supervisors.
- As to the claims of Rhonda Smith, the court WILL DENY the motion as to the period from October 2010 through the remainder of the relevant period but will GRANT the motion from May 2010 through September 2010.

The court WILL DENY the motion as to the claims of Daryl Carr, Anita Clark, Wanda Holt, Tommy Murray, Geraldine Parker, Teresa Phillips, Andrea Scott, Andrea Stallings, Julia Williams, and Rhonda Yancey.

Dated this 12th day of September, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE